SYNERCOM TECHNOLOGY, INC.

v.

UNIVERSITY COMPUTING COMPANY
and Engineering Dynamics, Inc.

Civ. A. No. CA–3–77–1455–G.

United States District Court,
N. D. Texas,
Dallas Division.

Aug. 24, 1978.

D. Arlon Groves and Ray G. Wilson of Bard & Groves, Houston, Tex., for plaintiff.

Thomas L. Cantrell of Schley & Cantrell, Stanley R. Moore of Crisman & Moore, Dallas, Tex., for defendants; W. Frederick Denkman of McClendon & Denkman, Metairie, La., of counsel.

## MEMORANDUM AND ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

This case presents claims of copyright infringement of instruction manuals and input formats used with a computer program designed to solve engineering problems incident to the analysis of structures.[1]

---

1. This order constitutes the court's findings of fact and conclusions of law entered after trial to the court.

The analysis of building structures under anticipated or actual conditions of use including the necessary strength of materials and design has for many years required numerous calculations and hundreds of hours of engineering time in the case of larger structures. Structural analysis is a sufficiently matured science that its analytical discipline calls for numerous essentially arithmetical and rote but time-consuming calculations. The grooved character of the discipline is further reinforced by the circumstance that most structures are made of materials with well known properties.

By the early 1960s, engineers had begun to use computers to perform many of these tasks. Given standardization of engineering principles underlying structural analysis, the relatively rote nature of their application, and the large markets for structural analysis, computer programs for structural analysis followed naturally.[2] A rudimentary knowledge of computers, the history of programs and the necessary tasks in program usage are an essential backdrop to the claims.

### The Computer

We are here concerned exclusively with digital computers.

A digital computer, as distinguished from an analog computer, operates on data expressed in digits, solving a problem by doing arithmetic as a person would do it by head and hand. Some of the digits are stored as components of the computer. Others are introduced into the computer in a form which it is designed to recognize. The computer operates then upon both new and previously stored data. . . .

. . . The method or program is a sequence of coded instructions for a digital computer. . . .

. . . A procedure for solving a given type of mathematical problem is known as an "algorithm." . . . *Gottschalk v. Benson*, 409 U.S. 63, 65, 93 S.Ct. 253, 254, 34 L.Ed.2d 273 (1972).

Most digital computers have five functional components: (1) input; (2) storage of the input by memory; (3) a control unit which receives data from memory and gives instructions for the arithmetic; (4) an arithmetic which carries out the control's commands; and (5) an output capability.

The computer program in a general sense instructs the computer regarding the things it is to do. In the industry, the physical machinery is referred to as hardware and the instructional material as software. In using a program one must have a format for input so that the input of data and the instruction to the computer are compatible with its program.

### Development of Statistical Analysis Programs

IBM by the early 1960s had developed a program for use in structural analysis called IBM FRAN (IBM 7090–7094 FRAN Framed Structure Analysis Program). IBM claimed no proprietary interest in FRAN and by 1965 FRAN, together with a "user's manual" prepared by IBM, were in the public domain. Other programs were also being developed including "STRUDL" developed at MIT, MAGIC, developed by Bell Aerospace, and SAP, developed at Berkeley.

### Synercom, the Plaintiff

Synercom, the plaintiff, is a Texas corporation formed in 1969 by James W. Bridges, Evan B. Pappas, and Douglas M. King, all engineers and former employees in Houston of McDonnell Automation Company (McAuto), an engineering consulting firm.

McAuto at one time employed over 100 engineers but by 1969 that number had dropped to about 50. McAuto used the FRAN program developed by IBM and published the "McDonnell FRAN Manual" on August 1, 1965. McAuto claimed no proprietary rights to its manual and made it available to its customers.

2. Because there are at least three occasions for analysis [(1) design of a structure; (2) its modi- fication; and (3) its failure], there is a substantial market for such programs.

McAuto engaged in the "software" end of the computer business, as later did Synercom and EDI, a defendant. The marketing arrangements among an engineering firm, a program seller, and a hardware supplier usually took the form of a market triad. The software peddler would sell to engineers the value of its program which with McAuto was (with some changes to be discussed) the old IBM-created FRAN program. The engineer would be schooled in the usage of the input formats so that he could gather the correct data and collate it for submission to a computer. The program would be stored in the memory of a computer owned by a "hardware company" such as University Computing Company (UCC). UCC would charge the engineering firm for the computer time, remitting part of that fee to the software owner as a royalty for use of the program.

The IBM FRAN program, although the progenitor of the program owned by Synercom (STRAN) was not well received in the marketplace. IBM's incentive to create the program was to generate customers for its computers. FRAN, however, was complex and difficult to use. Marketing the program required training of customer's engineers in its usage, a costly and time-consuming effort. Moreover, a substantial part of FRAN was usable only with IBM's 7090/7094 computer. McAuto did make changes in assembly language necessary to allow FRAN's use on the faster computers. This increase in speed (and reduced cost) and explanatory material for the using engineer helped but did not solve the problem. McAuto's FRAN remained complex and enjoyed little success in the market.

In May 1969, Bridges, Pappas, and King left McAuto and formed Synercom. This departure was on a friendly basis and Synercom became a customer of McAuto, at least for some services, but a competitor for others, principally the computerized structural analysis market.

*Synercom's Plan for STRAN*

Synercom believed that if access to the complex program could be made easier for the user, there was a substantial market for computerized structural analysis. The users of the program were usually design engineers but were often unsophisticated in the mysteries of the programs. Success of the Synercom strategy turned on development of instructional manuals and input formats that gave greater access to the program with less knowledge of the user— the simpler the input methods, the greater the market.

Using the IBM STRAN Manual, the McAuto improvements of that manual and other expert data, Synercom developed a new manual (now in its fourth edition) and new input formats. Unlike McAuto, Synercom has attempted to retain proprietary rights by copyright registration and notice. That effort has spawned this controversy. Synercom also made improvements in the IBM FRAN program (to be discussed in more detail later), but continued to use its solution algorithm.

In November of 1969, Synercom, then six months old, offered STRAN Program on a Control Data Corporation (CDC) 6600 series computer.[3] This first sales effort in the fall of 1969 was launched without a user's manual. By November 1970, Synercom, after considerable work, offered an "expanded" version of STRAN bearing the number 4001–1–1 accompanied by the first edition of the manual and bearing the notice "(copyright symbol) 1970—Synercom Technology, Inc. All Rights Reserved". The title page of all copies of the "1st Edition" STRAN User's Manual carried the notice "(copyright symbol) 1970—Synercom Technology, Inc. All Rights Reserved". The "1st Edition" STRAN User's Manual was printed in the United States by Gino's Prints, Houston, Texas, and was published (within the meaning of Title 17, U.S. Code) on October 8, 1970. Before preparation of the "1st Edition" STRAN User's Manual, a pre-

---

3. That version of STRAN was later offered on a Univac Corporation 1108 computer followed by the IBM 360 computer.

liminary draft copy of the manual was prepared by Synercom but all copies bore the notice "(copyright symbol) 1970—Synercom Technology, Inc. All Rights Reserved". It was never publicly distributed. The exact number of the preliminary draft copies is not known, but few were made. Indeed only 120 copies of the "1st Edition" STRAN User's Manual were printed.

The STRAN User's Manual, Second Edition, was printed in the United States by Gallery Printing Company, Houston, Texas, and was published on October 15, 1971. Only 300 copies of the second edition were printed and few were distributed. The title pages all carried the notice "(copyright symbol) Copyright, Synercom Technology, Inc. 1971 All Rights Reserved" and bore the number 401–1–3.

The first printing of the STRAN User's Manual, Third Edition, was printed in the United States by L. R. Golson, Houston, Texas, and published before September 18, 1973. Only 300 copies of the third edition were printed and few were distributed. The title pages of all copies carried the notice "A Synercom Technology, Inc., Program Product 1973 (copyright symbol) 1973 Synercom Technology, Inc. All Rights Reserved" and bore the number 401–1–3. This development of the manual program changes and related efforts required approximately four man years at a cost in the range of $100,000.

The STRAN program (as detailed in the 1973 third edition of the user's manual) and the original FRAN program of IBM as modified by McAuto had substantial differences both in techniques for use and in product. STRAN had a greater analytical capacity such as final stress analysis calculation to determine compliance with applicable codes and specifications. At the same time the input for STRAN was more easily collated resulting in less training time for users. STRAN was also more efficient in its output. For example, FRAN's output could fill boxes with calculations which STRAN could achieve with a few pages.

STRAN's input formats were unique. Many of the same calculations could be made with use of a "post processor" program such as one developed by Rust Engineering of Atlanta, Georgia, and the input task could similarly be accomplished by a "preprocess" program. But the result would be usage of three separate programs to achieve the results STRAN had packaged. Thus one of the improvements was the telescoping of many functions into the single STRAN program. Moreover, STRAN offered more sophisticated analysis than the combined use of FRAN and a Rust Engineering postprocessing program.

There are hundreds of programs available for structural analysis, and at least fifteen are competitive with STRAN. All but EDI and Synercom have different input formats.

### The Formats

Synercom's input formats have nine classes of inputs. Synercom conceived their logic and arranged their sequence. Synercom secured any common-law rights by publishing the input formats with notice of reservation of copyright. In late 1976 Synercom received registrations of its claims to copyright in the input forms. The forms and registration certificates are as follows:

| EXHIBIT | FORM TITLE(S) | EXHIBIT | CERTIF. NO. |
|---|---|---|---|
| B | Loan Condition Card Format; Temperature Loan Card Format; LDCOMB Data; End Card | BB | A 811,473 |
| C | UCRANGE Data; AMOD Data | CC | A 811,474 |
| D | Loan Data (1976 publ.) | DD | A 811,475 |
| E | Joint Data (1976 publ.) | EE | A 811,476 |
| F | Loan Data (1970 publ.) | FF | A 811,477 |
| G | Joint Data (1970 publ.) | GG | A 811,478 |

| EXHIBIT | FORM TITLE(S) | EXHIBIT | CERTIF. NO. |
|---------|---------------|---------|-------------|
| H | Group Property Data (1976 publication) | HH | A 811,479 |
| I | Job Identification and Heading Information; Options Data (1976) | II | A 811,480 |
| J | Member Data (1970) | JJ | A 811,481 |
| K | Group Property Data (1972 publication) | KK | A 811,482 |
| L | Job Identification and Heading Information; Options Data (1972) | LL | A 811,483 |
| M | Member Data (1976) | MM | A 811,484 |
| N | Section Property Data | NN | A 811,485 |

The original publications of each consist either entirely or predominately of material that is new and original to Synercom except for two, the Load Data and Joint Data input forms. As to these two, Synercom asserts that their *arrangement* of information is new and original, and they therefore enjoy protection from copying of their unique *arrangement.*

### EDI, UCC, and SACS II

The first efforts of Synercom to market STRAN usage was with Bonner and Moore, Inc., a Houston firm. But by the latter part of 1972, Bonner and Moore had lost interest. John Fowler, while an engineer employed by Boeing Aircraft at its plant in New Orleans, Louisiana, became familiar with a program for structural analysis developed by Boeing called SAMECS. Neither Boeing nor the U. S. government claimed any proprietary rights in the program. When Boeing's New Orleans plant closed in the fall of 1973, Fowler took much of the data regarding SAMECS with him. Fowler, with Dr. David Garland, another former Boeing engineer, then formed EDI.

In the summer of 1974, Bonner and Moore (no longer marketing STRAN with Synercom, who meanwhile had placed STRAN with UCC) acquired an engineering consulting firm in New Orleans and proposed that EDI manage the newly acquired office. The joint effort included development of a structural analysis program to compete with STRAN in the lucrative Gulf Coast market, principally Houston, Texas.

Bonner and Moore told EDI that to be successful in the marketplace its new program called SACS II, must be wholly compatible with the STRAN format. That is, it most be able to receive its data input and allow STRAN users to switch to SACS II with a minimum of training and without loss of data accumulated in stores of key-punched cards, called data decks. EDI's president, Fowler, was not a stranger to STRAN, having obtained a copy of a brochure designed for users of STRAN and earlier printed by Bonner and Moore while Bonner and Moore and Synercom were working together.

By the time EDI entered the market with SACS II, Synercom was enjoying considerable success with STRAN. But that success had required substantial investment in training customers to use STRAN input formats. By that time incurred costs approached $500,000. This cost was perforce reflected in the Synercom price for use of STRAN. Without the cost of developing the input formats or of training customers in their usage, EDI was in position to simply pluck the fruit of Synercom's labors and risks, if SACS II was as good or better than STRAN. An internal memorandum of EDI written in late 1976 reveals EDI's marketing plan, and it was simple.

MSA (EDI's family of programs) series of programs are "completely compatible

with MARCS from Synercom in Houston (our primary competition)." By simply changing to UCC's control cards, a user can switch from MARCS to MSA. Pricing will be established to beat the MARCS package significantly so this should be an easy market to capture. The memorandum further noted that EDI's program features "input data transport to MARCS", meaning "no re-evaluation" of the customers (of Synercom) and "no re-formatting of data." EDI then wrote a preprocessing program that made SACS II wholly compatible with the STRAN input formats.

To complete the present alignment of the cast, one more player must be added—UCC. By early 1976, the relationship between Synercom and UCC had deteriorated and in May or June of 1976, UCC sought out EDI, anticipating that Synercom would not renew its contract whose expiration date was near. Thus in the summer of 1976, a new market triad was born—UCC with SACS II being sold by EDI, a marketing effort if not aimed squarely at the old Synercom accounts included them in its sights.

### Manuals

In the summer of 1975 EDI had distributed its EDI Manual without copyright or other proprietary notice to its customers and potential customers. EDI did not furnish format cards, but its instruction manual which contained mirror images of some of the input cards and instructions effectively enabled a customer to use the STRAN input format. The EDI Manual contained no page numbers and no reference to UCC, but before publication of the EDI Manual, EDI had access to the STRAN User's Manual, Third Edition.

In the latter part of 1976 and after distribution by Synercom of its STRAN User's Manual, Third Edition with copyright notice, EDI published user's manuals for its SACS II program entitled "SACS II CODING INSTRUCTIONS" ("EDI Manual"). Also in the latter part of 1976 UCC distributed user's manuals for EDI SACS II program (hereafter referred to as the "UCC Manual"). The UCC Manual contains on its title page the names and addresses of both UCC and EDI, UCC's designation "UCC 3581" and the publication date of "8–76", i. e., August, 1976. The UCC Manual was published without copyright or other proprietary notice and was distributed by both UCC and EDI to customers and potential customers. The UCC Manual contains page numbers and was physically produced in Texas by UCC from a master provided to it by EDI. Other than for differences in the title pages and the addition of pagination, the UCC Manual is a copy of the EDI Manual. Before publication of the UCC Manual, UCC had access to the STRAN User's Manual, Third Edition.

These facts present four ultimate questions. First, does Synercom hold valid copyrights on its manuals and input cards. Second, has EDI and UCC infringed any of these copyrights. Third, what relief is available. And fourth, have EDI and UCC competed unfairly.

### Validity of Copyrights

The attack of EDI and UCC at trial was upon "originality" of the manuals and with lesser emphasis they urged that Synercom published without notice before any claim to proprietary rights. Extensive evidence demonstrated that parts of the STRAN manuals contained paragraphs virtually identical to manuals earlier published by McAuto, FRAN, and others. Indisputably parts of the STRAN manual (first edition and brought forward through succeeding editions) were in no sense of the word original with Synercom; but equally undisputed was that substantial parts of all Synercom manuals were original in every sense of the word.

■ Although originality is judicially imposed gloss upon the copyright statute, its legal force and definition are settled. As stated by Judge Friendly:

Although "[t]he Copyright Act nowhere expressly invokes the requirement of originality," courts have uniformly inferred this from the constitutional and statutory condition of authorship. . .

However, originality has been considered to mean "only that the work owes its origin to the author, i. e., is independently created and not copied from other works." *Puddu v. Buonamici Statuary, Inc.,* 450 F.2d 401, 171 U.S.P.Q. 709 (2d Cir. 1971).

Continuing, the court related:

Originality sufficient for copyright protection exists if the "author" has introduced *any* element of novelty as contrasted with the material previously known to him." (Emphasis added) *Puddu v. Buonamici Statuary, Inc.,* 450 F.2d 401, 171 U.S.P.Q. 709 (2d Cir. 1971).

EDI's and UCC's effort to defeat proof of originality is confronted by the fact that at least 70% of the prose found in Synercom's manuals is indeed original to Synercom. Although proof of prior art is familiar to patent law, under copyright law the 30% nonoriginal content does not void the copyright as to the 70% or even the 30%, at least as an integrated part of a product whose whole is original. This is not to infer that Synercom's copyright removed the nonoriginal material from the public domain. It is to say that if an assembly of parts—old and new—results in original expression, the whole is protected. In the case at hand, with only approximately 21% of the material in Synercom's STRAN User's Manual, Third Edition being based upon prior material and the remaining 79% being *entirely* original, Synercom has contributed something "recognizably its own" to prior treatments of the same subject. Its copyright is not invalid because some parts of the whole were not independently conceived. Unlike the patent law, originality is not first idea but independent conception. As L. Hand stated it:

[T]he law imposes no prohibition upon those who, without copying, independently arrive at the precise combination of words or notes which have been copyrighted. *Fred Fisher, Inc. v. Dillingham,* 298 F. 145, 147 (S.D.N.Y.1924).

The requirement of originality is an *a priori* result of protecting expression only by forbidding copying. That is, because the grant of exclusivity to the copyright holder is only of the right to copy the expression, originality can require no more than independent work. But requiring the work to be independent does not deny the role of synergism in protectable expression. As the Ninth Circuit stated in reviewing a copyright contest of a musical piece entitled "Bubbles":

In fact, "Bubbles" does have a sequence commonly found in other musical pieces. The copyrightability of "Bubbles" is not the four-note sequence, but the fitting together of this sequence with other melodious phrases into a unique composition. *Granite Music Corp. v. United Artists Corp.,* 532 F.2d 718, 721 (9th Cir. 1976).

It follows that the copyright registrations for Synercom's first and second editions which contain only slightly less new matter than the third edition are also valid.

*Prior Publication*

The allegation that there was a publication authorized by Synercom without notice of claimed copyright is quickly dispatched.

". . . [P]ublication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public . . .." *Bartok v. Boosey & Hawkes, Inc.,* 523 F.2d 941, 945 (1975), quoting 1 M. Nimmer, *The Law of Copyright,* § 49 at 194–95.

Defendants allege four "instances" of authorized publication without copyright notice: Bonner and Moore, Raymond International, Fluor Ocean Services (which purchased Bonner and Moore) and Lawrence Allison. The evidence offered is sparse and equivocal. It never preponderates in defendants' favor. And defendants had the burden of establishing publication, without notice, with the consent or fault of Synercom. *See Modern Aids, Inc. v. R. H. Macy & Co., Inc.,* 264 F.2d 93 (2nd Cir. 1959); *Judscott Handprints, Ltd. v. Washington Wall Paper Co., Inc.,* 377 F.Supp. 1372 (E.D. N.Y.1974), 2 Nimmer, *The Law of Copyright,* § 703 (1978).

Synercom is said to have authorized Bonner and Moore to publish a brochure (Defendants' Exhibit 20) and the input formats. The court found no credible evidence of this defensive claim, including the uncertain testimony of witness Pye. Moreover, when pressed on cross-examination, Pye conceded that he had no personal knowledge that Synercom authorized Bonner and Moore to print or distribute the brochure. He also lacked personal knowledge as to the number of copies printed. Even his "estimate," which given its basis was little more than speculation, placed the number at only 100. The claim that the brochure was published has a hollow ring when faced with the fact that defendant was less than candid about when and how it came to have the brochure in its possession. Publication by a licensee of "vast numbers of copies without copyright notice may work a forfeiture" if done with full knowledge of a licensor who acquiesces. 2 Nimmer, *The Law of Copyright* § 7.03 (1978). No such publication occurred here. If contrary to the evidence, the brochures were widely distributed, there would be little reason for EDI's secretive attitude toward its copy. The court is unwilling on this record to find the claimed authorized publication.

Although Synercom did authorize Raymond International and Fluor to make copies for their internal use, there is no evidence of authorized distribution or reproduction without copyright notice. David Engel's testimony when carefully considered was not based upon personal knowledge. In fact, he at one point stated that although he did not know, the forms very likely did have copyright notices on them (dep. p.7, 1.7). Engel did testify that some of the forms now used by Raymond International did not have a Synercom copyright notice, but there is no evidence of probative value that these were for other than internal use or critically that Synercom authorized this deletion.

Proof (by way of the deposition of Robert Jack Herring) that Lawrence Allison was authorized to copy and distribute without notice of copyright was not sufficient. Herring's testimony appears to be regarding his experience at Fluor's Ocean Services, Bonner and Moore's purchaser. Moreover, Herring testified that he had no personal knowledge that Synercom knew ". . . how Fluor was inputting its data to either the STRAN or SACS program . . . ." (dep. p. 6, 1.15). And that relationship has been otherwise examined and found to be insufficient to support defendants' assertions.

*Input Formats*

EDI and UCC here contend that the formats are mere forms not intended to convey information and are not subject to copyright. That these ciphers bear the computer world name of formats is unfortunate because it suggests that they are formats as that term is used in copyright law; they are not.

Certainly blank forms are not the subject of copyright. *See Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1879); *Aldrich v. Remington Rand, Inc.*, 52 F.Supp. 732 (N.D. Tex.1942). However "forms" which communicate information can be the subject of copyright. *See Harcourt, Brace & World, Inc. v. Graphic Controls Corporation*, 329 F.Supp. 517 (S.D.N.Y.1971). And code books have received protection. *See Reiss v. National Quotation Bureau, Inc.*, 276 F. 717, 719 (S.D.N.Y.1921); *Hartfield v. Peterson*, 91 F.2d 998 (2nd Cir. 1937). As the court there stated (about a form used to record answers to multiple choice tests):

The answer sheets here, alone, have their own meaning, convey information, involve original creation, have their own uses, and are thus "writings" under the Copyright Act. *Harcourt, Brace & World, Inc. v. Graphic Controls Corporation*, 329 F.Supp. 517, 524 (S.D.N.Y.1971).

The litmus seems to be whether the material proffered for copyright undertakes to express. At first glance these input formats are simply devices for the assistance of the user to facilitate his task— forms. On reflection, however, one must conclude that they indeed express ideas. The usage by EDI of the formats (which it

contends is not infringing) undercuts its argument that the input formats are not expression. EDI does not furnish card formats to the customer for use; instead it expects the customer to use an 80-column paper, common to the industry. However, in its manual used to instruct users of its SACS II program, it used mirror images of the forms themselves. Their usage only buttresses the reality that these input formats express to the user the sequencing of data for simplified access to the computer programs. The formats by their placement of lines, shaded art, and words tell the user what data to place where and how to do it. It communicates the selection arrangements and the sequence. That was the usage EDI made of it. It follows that the formats are copyrightable if the ideas they express are separable from their expression. This issue is focused by examining the companion question of infringement.

### Infringement

#### A. Formats

Closely related to the contention that the formats do not contain expression is the defensive argument that EDI has only used any ideas expressed by the formats. The argument continues that stopping EDI's usage would give the formats patent, not copyright protection.[4]

EDI was free to "read" Synercom's formats and employ their teaching; it was not free to "copy" the formats and contends that it did not. Thus the issue is whether EDI copied expressed ideas or their expression. EDI put forward an alternative argument that because use of the idea required substantial duplication of Synercom's arrangements and sequencing, copyright protection ought not be allowed.

One can argue that inseparability of idea and expression is here an antinomy. The argument asks if the idea and the usage are not separable, what is the expression?

EDI argues that it did not "copy" t[he] formats, pointing out that it did not ev[er] use preprinted formats. EDI instead wro[te] a preprocessor program to accept Syne[r-] com's exact formats. The FORTRA[N] statements in its preprocessor program ar[e] derived directly and precisely from the copyrighted manual card formats. This was not accidental. Independent and coincidentally exact duplication was a statistical improbability. By varying only the order constituent of the format instruction, the manner of communicating with the computer may be expressed in ten factorial (10–9–8–7–6–5–4–3–2–1); that is 3,628,800 expressions. It is true that the common engineering problem and common discipline of users would reduce the number of practical variances; regardless before trial ended defendant had conceded that they had indeed done what they set out to do—exactly duplicate. But critically, EDI in doing so, has only appropriated the idea expressed by the formats; that it was deliberate is immaterial.

Title 17 § 1 grants to the copyright owner the exclusive right " . . . (b) to translate the copyrighted work into other language or dialects, or make any other version thereof, if it be a literary work . . ." Synercom urges that EDI's preprocessor program infringes because it does no more than translate the expression of the formats to a different computer language, unless the subject matter here is not classed as a literary work. The copyright office so classified it although its decision is not determinative.

It has long been the law that " . . . in cases of literary or artistic works, and works of similar character, in which the form, arrangement or combination of ideas represents the product of labor and skilled effort separate and apart from that entailed in the development of the intellectual conception involved, that in such a situation, the medium of expression is entitled to protection by copyright against adoption by

4. *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718 (9th Cir. 1976):
   "We recognize that a statutory copyright does not give a monopoly over an idea or a

musical phrase, but merely protects against the unlawful reproduction of an original work." *Id.*, at 720.

another in similar form, arrangement, and combination." *Long v. Jordan*, 29 F.Supp. 287, 288 (N.D.Cal.1939). And writings of an author need not be "tangible to the human eye." *See Goldstein, et al v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973) where in deciding that records of artistic performance are under clause 8 of the act, Chief Justice Burger noted that writings " . . . may be interpreted to include any physical rendering of the fruits of creative intellectual or aesthetic labor. . . . ." *Id.*, at 561, 93 S.Ct. at 2312.

■ All of this is clear. The difficult question is whether EDI plagiarized Synercom's idea or its expression. If the idea is the sequence and ordering of data, there was no infringement. If sequencing and ordering of data was, however, expression, it follows that EDI's preprocessor program infringed. As earlier suggested and as will be demonstrated, Synercom's argument is double-edged. If sequencing and ordering is expression, what separable idea is expressed?

A hypothetical, oversimplified, may serve to illuminate the idea versus expression controversy. The familiar "figure-H" pattern of an automobile stick is chosen arbitrarily by an auto manufacturer. Several different patterns may be imagined, some more convenient for the driver or easier to manufacture than others, but all represent-

ing possible configurations. The pattern chosen is arbitrary, but once chosen, it is the only pattern which will work in a particular model. The pattern (analogous to the computer "format") may be expressed in several different ways: by a prose description in a driver's manual, through a diagram, photograph, or driver training film, or otherwise. Each of these expressions may presumably be protected through copyright. But the copyright protects copying of the particular expressions of the pattern, and does not prohibit another manufacturer from marketing a car using the same pattern. Use of the same pattern might be socially desirable, as it would reduce the retraining of drivers. Likewise, the second manufacturer is free to use its own prose descriptions, photographs, diagrams, or the like, so long as these materials take the form of original expressions of the copied idea (however similar they may be to the first manufacturer's materials) rather than copies of the expressions themselves. Admittedly, there are many more possible choices of computer formats, and the decision among them more arbitrary, but this does not detract from the force of the analogy.

Synercom's argument that the order and sequence of data was the expression, not the idea, has been rejected.[5] Its accept-

---

5. If Synercom's contention were sound (it is not because EDI appropriated ideas, not expression), it would follow that translating the expression of the manual to FORTRAN to another manual equally would be an infringing use. This is true because it is as clear an infringement to translate a computer program from, for example, FORTRAN to ALGOL, as it is to translate a novel or play from English to French. In each case the substance of the expression (if one may speak in such contradictory language) is the same between original and copy, with only the external manifestation of the expression changing. Likewise, it would probably be a violation to take a detailed description of a particular problem solution, such as a flowchart or step-by-step set of prose instructions, written in human language, and program such a description in computer language. But here the similarity to literary translation ends. The preparation of a computer program in *any* language from a general de-

scription of the problem to be solved (as, for example, is contained in the forms and manuals, which prescribe a problem involving a set of ordered inputs in a particular arrangement which must be accepted by the computer and transmitted to the FRAN program) is very dissimilar to the translation of a literary work, or to the translation of a program from one language to another. In most cases, the formulation of the problem in sufficient detail and with sufficient precision to enable it to be converted into an unambiguous set of computer instructions requires substantial imagination, creativity, independent thought, and exercise of discretion, and the resulting program can in no way be said to be merely a copy or version of the problem statement. The program and the statement are so different, both in physical characteristics and in intended purpose, that they are really two different expressions of the same idea, rather than two different versions of the same expression. Hence EDI's preparation

ance, although answering EDI's claim of noninfringement, would result in a finding that the formats are not proper subjects for copyright protection.

## B. *Format Copyrightability Revisited*

As noted "in cases of literary or artistic works, and works of similar character, in which the form, arrangement, or combination of ideas represents the product of labor and skilled effort *separate and apart from that entailed in the development of the intellectual conception involved*," copyright protection is available. *Long v. Jordan*, 29 F.Supp. 287, 288 (N.D.Cal.1939) (emphasis supplied). Here if order and sequence is the expression, the skilled effort is not separable, for the form, arrangement, and combination is itself the intellectual conception involved. It would follow that only to the extent the expressions involve stylistic creativity *above and beyond* the bare expression of sequence and arrangement, should they be protected. As Mooers states:

> Also included in the "expression" is the sequence, choice, and arrangement of descriptive elements . . .. Calvin N. Mooers, *Computer Software and Copyright, Computing Surveys*, Vol. 7, No. 1, March 1975 at p. 50.

This is because in the usual case sequence, choice, and arrangement have only stylistic significance, rather than constituting as they would here, the essence of the expression. Finally, Copyright Circular 32 states "Thus, there is no way to secure copyright protection for the idea or principle behind a blank form or similar work, or for any of the methods or systems involved in it." The "idea or principle" behind the forms in question, and the "method or system" involved in them, would be no more or less than the formats. The manuals are copyrightable, but the formats would not be. In sum, if the court is wrong in its finding that order and sequence are expressed ideas, not expressions, its alternative hold-

ing is that the formats are not copyrightable.

## C. *Manuals*

There is little question but that EDI and UCC have infringed Synercom's manuals. EDI and UCC have (since the commencement of trial) not seriously contended that its use of the Synercom manuals would not be an infringing use. The battle here was over the validity of the manual's copyrights. Substantial portions of EDI's (and UCC's) manuals are verbatim from the Synercom manual. Some of the Synercom material copied had been in turn copied by Synercom. Nonetheless, some material by UCC and EDI had not been. This question, unlike the others, presents little subtlety.

## Unfair Competition

The court is not satisfied with the adequacy of the briefing on this question. If Synercom wishes to persist in a claim of unfair competition, it will file a brief within thirty (30) days of this order. EDI and Synercom will respond within fifteen (15) days of receipt of the Synercom brief. All briefs will be addressed to the facts as found in this order.

## Relief

Prefatory to a consideration of relief, the following explicit facts are found:

EDI knew before entering the market with its SACS II program that Synercom's STRAN User's Manuals were copyrighted by Synercom.

The infringements by UCC and EDI were willful, deliberate, and for profit. Court action in this dispute was initiated on February 9, 1977, by the filing by EDI, in the United States District Court for the Eastern District of Louisiana, of a complaint (1) seeking a declaratory judgment of invalidity of Synercom's copyrights, (2) alleging "unfair competition" by Synercom, and (3) alleging fraudulent procurement and antitrust violations by Synercom. EDI also

---

of a FORTRAN preprocessor program from the descriptions contained in the manuals cannot constitute an infringing derivative use provided

this was done without copying of the plaintiff's FORTRAN program, as it was.

sought, unsuccessfully, a temporary restraining order against Synercom.

Substantial parts of the accusations in the action initiated by EDI were groundless. At the ultimate trial on Synercom's request for a permanent injunction, EDI abandoned all allegations of unfair competition, fraud, and antitrust violations, and presented no evidence in their support.

Between its filing of the complaint and trial on the merits, EDI conducted this litigation in a manner calculated to delay hearing on the merits and to increase the costs of litigation to Synercom as much as possible.[6]

An extraordinary amount of needless discovery was initiated by EDI: substantively thousands of interrogatories, and nearly 30 dispositions. Additionally, numerous motions without merit were filed by EDI, their purpose being to delay and to increase costs. Throughout EDI steadfastly denied that it ever had access to the Synercom materials, until shortly before trial when it filed its answer to Synercom's First Amended Complaint. Also, until trial, EDI steadfastly maintained (a) that there were no similarities between its manual and Synercom's materials, and (b) if there were, such similarities were "purely coincidental" or because "engineers tend to think alike." EDI knew these contentions were untrue at the time it made them, which coupled with their abandonment before the court, is sufficient to warrant an award of a reasonable attorney's fee to Synercom.

Additionally, officers of EDI executed affidavits to the effect that the Synercom principals had "stolen" their program, documentary materials, that they were trying to "force EDI out of business", that they were making untrue representations to customers and potential customers, and that they were "harassing" EDI's customers. EDI made no such allegations at trial. If this is accepted conduct in the marketplace, it is not in a court of justice.

### Order

Synercom is now entitled to injunctive relief and further discovery regarding other possible relief. It is ORDERED that the defendants, their agents, servants, officers, and employees, privies, successors, and assigns, and all holding by, through or under them or any of them be and the same are hereby perpetually ENJOINED and RESTRAINED as follows:

All "printed infringing materials" shall mean all printed material derived, directly or indirectly, from Synercom's copyrighted materials, and shall include all user's manuals and other instructional literature for the SACS II program, whether the "UCC Manual" or the "EDI Manual", preliminary draft versions or later versions or copies, abridgments or translations.

1. Defendants EDI and UCC shall hereafter produce no printed infringing materials;

2. Defendants EDI and UCC shall, separately, and within 20 days of the filing of this memorandum and order, account under oath for the production of all printed infringing materials and deliver to Synercom's attorney a list of all entities to which any printed infringing materials have been delivered, and, also recall by written request all printed infringing material and provide Synercom's attorney with copies of all written requests for recall; and

3. Defendants EDI and UCC shall return to Synercom's attorney all recalled printed infringing materials. Defendants shall complete the recall within 60 days of the filing of this order.

### Attorney Fees

Synercom shall have and recover from defendants EDI and UCC the costs of this suit and a reasonable attorney's fee, in an amount to be determined later.

### Discovery

The parties may proceed with such discovery as shall be necessary to establish the

---

6. This was before counsel was retained. The conduct of present counsel has been professional in every way.

amount of damages, profits, and other awards as may be proper in the accounting phase of this case.

*Stay*

Enforcement of the order is stayed pending resolution of the unfair competition claim. If Synercom does not wish to pursue the unfair competition claim, the court will entertain an application for stay pending an appeal.