**BRODERBUND SOFTWARE, INC., a California corporation, and Pixellite Software, a California general partnership, Plaintiffs,**

v.

**UNISON WORLD, INC., Defendant.**

No. C–85–3457 WHO.

United States District Court,
N.D. California.

Oct. 8, 1986.

Claude M. Stern, Scott D. Baker, Horwich & Warner, San Francisco, Cal., for plaintiffs.

Robert W. Dunaway, Paul David Marotta, Remer, Remer & Dunaway, Mountain View, Cal., for defendant.

## OPINION AND ORDER

ORRICK, District Judge.

In this action for audiovisual copyright infringement, textual copyright infringement, trademark infringement, and unfair competition, the Court severed the case, and tried only the liability portion of the audiovisual copyright infringement claim. For the reasons set forth in this Opinion, which constitute the Court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), the Court finds the defendant has infringed the copyright of plaintiff Pixellite Software on the audiovisual displays of the computer program known as The Print Shop.

### I

Plaintiffs, Broderbund Software, Inc. ("Broderbund"), and Pixellite Software ("Pixellite"), are the exclusive licensee and the copyright holder, respectively, of a computer software printing program called

"The Print Shop" ("Print Shop"). Defendant, Unison World, Inc. ("Unison"), markets a computer software printing program called "The Printmaster" ("Printmaster"). Both "Print Shop" and "Printmaster" are menu-driven programs that enable their users to create customized greeting cards, signs, banners, and posters. Plaintiffs claim that the overall appearance, structure, and sequence of the audiovisual displays in "Printmaster" infringe plaintiffs' copyright on "Print Shop."

David Balsam and Martin Kahn, the principals of plaintiff Pixellite Software, began developing "Print Shop" in the spring of 1983. At the time, the program was known as "Perfect Occasion" and was not a printing program. Rather, it was a program that would allow its users to create custom greeting cards out of the software disks themselves. "Perfect Occasion" would have allowed users to type their greetings, surrounded by graphics and borders, onto the disks. The disks would then be mailed or otherwise delivered to the recipient, who would need access to a compatible personal computer to view the "greeting card." Balsam and Kahn spent two or three months developing "Perfect Occasion" and showed it to Broderbund in the summer of 1983.

Concerned about the salability of a program that created greetings cards legible only on computers, Broderbund encouraged Balsam and Kahn to convert "Perfect Occasion" into a printing program. Balsam and Kahn, with the help of Broderbund artists, spent almost an entire year developing what was to become "Print Shop." Broderbund obtained from Pixellite an exclusive license to distribute "Print Shop" worldwide and began marketing the product in May 1984. At the time of its introduction onto the market, "Print Shop" could be operated only on Apple computers. The product was a success, selling approximately 500,000 copies (to date of trial) at a manufacturer's suggested retail price of $49.95.

Defendant, Unison, is primarily engaged in the business of converting other publishers' software to make it adaptable with different computers. Unison rarely, if ever, develops entirely original programs. As of April 15, 1986, Unison had developed software for Epson, Sharp, and Panasonic. In May 1984, the president of Unison, Hong Lu, approached the president of Broderbund, Douglas Carlston. At the time, Unison was programming a video game called "Flappy," which was a conversion of a game created by DB Soft, a Japanese company. Lu wanted to know if Broderbund would consider publishing "Flappy."

From their dealings concerning "Flappy," Broderbund and Unison also began discussing the possibility of converting the just-released "Print Shop" to make it adaptable with other computers, mostly Japanese. Lu had excellent contacts with Japanese software producers. When Broderbund personnel went to tour Unison's facilities, Lu told them he was also interested in the conversion rights to an IBM version of "Print Shop." Lu told Edward Bernstein, Broderbund's director of product development, that Unison could create a "Print Shop" version for IBM computers in three months. Bernstein was skeptical about whether Unison could actually produce a quality conversion within three months. Broderbund had already made several unsuccessful attempts to produce an IBM version of "Print Shop."

Although Broderbund originally informed Lu that the IBM rights to "Print Shop" were unavailable, at some point Broderbund developed a need for an IBM conversion. Unison personnel met with Balsam and Kahn to discuss whether it was really possible in three months to create an IBM version that was faithful to the original. Broderbund made it clear that if Unison were to receive the IBM rights to "Print Shop," it had to produce an exact reproduction of the original. Balsam very briefly showed the source code (the text that is translated into an "object code" and then directs the computer to perform its functions) to one of Unison's programmers, MacDuff Hughes, to give Hughes a feel for the depth and complexity of "Print

Shop." Balsam also gave Unison personnel some commercially-available copies of "Print Shop" to show Japanese producers.

For the next four to six weeks, programmer Hughes was under orders from both Lu and David Lodge, Unison's products manager, to develop a program as identical to "Print Shop" as possible—to "imitate" it. Balsam and Kahn would meet periodically with Hughes to discuss Hughes' progress in developing the IBM version. Kahn, who handled the programming duties for Pixellite, told Hughes that the aspect ratios (governing the proportioning of dots), hollowing (placing white borders on individual letters to make them stand out) and kerning (closing spaces between letters) would be difficult. Hughes set out to recreate "Print Shop" as closely as possible.

After Hughes had made considerable progress toward a faithful reproduction of "Print Shop," however, negotiations for the IBM rights broke down. Lu felt Broderbund was offering an insufficient advance payment on Unison's percentage of the royalties. Lu now told Hughes to stop copying "Print Shop" because the negotiations had failed. Instead, Lu instructed Hughes to finish developing their *enhanced* version of "Print Shop" as soon as possible. Hughes was no longer to feel "constrained" by the actual structure or appearance of "Print Shop"—he was now free to improve on it. This enhanced version would then be released by Unison as its own creation. By releasing its own enhanced version of "Print Shop," Unison was simply following what had been Lu's game plan all along. Lu wished to obtain the "Print Shop" or Broderbund name, but he always intended to release some enhanced version of "Print Shop," whether or not he could reach a licensing agreement with Broderbund.

Lu's order to stop any further copying of "Print Shop" did not include copying that had already been incorporated into Hughes' work in progress. Hughes had already finished the menu screens, so he kept them. He had also finished about ten screens in

the "greeting card" and "sign" functions, which he kept. And, despite the fact that he had a totally different idea for the user interface in the "picture editor" function, Hughes used the "Print Shop" user interface because it was "much further along." Hughes thought it would be a waste of time to go back and redesign the screens, and he was in a hurry to finish the project so he could get back to Stanford, where he was a mathematics major.

After Hughes finished his part of the project, other programmers at Unison added a "calendar" function to the IBM version, streamlined the method by which the user could select ready-made designs, and provided for the memorization of designs. The Unison-IBM version otherwise remained the same as Hughes had designed it.

In March 1985, Unison released its program under the name "Printmaster." On May 28, 1985, plaintiffs brought this action for copyright infringement, trademark infringement, and unfair competition. In November 1985, Broderbund released its IBM version of "Print Shop." It is to these facts that the Court now applies the law applicable to audiovisual copyrights.

## II

### A. *Are the Audiovisual Displays Protected under the Copyright Laws?*

First and foremost, the Court must deal with the threshold issue, the protection *vel non* of audiovisual displays under the copyright laws.

#### 1. *The dichotomy between ideas and expression.*

■ It is axiomatic that copyright protects only the expression of ideas and not the ideas themselves. *See Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954); *see also* 17 U.S.C. § 102(b) (1977). Thus, if an idea is indistinguishable from its expression, that is, if the idea is "merged" into its expression, the expression cannot be protected under the copyright laws. For example, in *Herbert Rosenthal Jewelry Corp. v. Kalpakian,*

446 F.2d 738, 741–42 (9th Cir.1971), the court held that the idea of a jewel-encrusted bee pin could not be distinguished from the expression of that idea. As long as more than one manufacturer produced jewel-encrusted bee pins, the court found, it was inevitable that there would be a substantial similarity between the two forms of expression. In other words, the number of ways in which one can design a jewel-encrusted bee pin is strictly limited. Under such circumstances, to give one manufacturer a copyright on its bee pin would be to give that manufacturer a monopoly on the jewel-encrusted bee pin market because no other manufacturer could possibly conceive of a substantially different jewel-encrusted bee pin.

■ Defendant herein argues that the idea underlying the menu screens, input formats, and sequencing of screens in "Print Shop" is indistinguishable from its expression. Any menu-driven computer program that allows its users to print greeting cards, signs, banners, and posters will have a user interface substantially similar to that in "Print Shop," defendant contends, because there is no other conceivable way to structure such a program. The evidence at trial disproved defendant's contention. Plaintiffs introduced a program titled "Stickybear Printer," marketed by Weekly Reader Family Software, that allows its users to print greeting cards, signs, banners, and posters with variable combinations of user-dictated text, graphics, and borders. The functions of "Stickybear Printer" are substantially the same as the functions of "Print Shop"; thus, it can be said that the ideas underlying "Stickybear Printer" and "Print Shop" are the same. Yet the expressions of those ideas are very different. The menu screens and sequence of screens in the two programs are different. The entire structure and organization of the user interfaces are different. In short, the existence of "Stickybear Printer" proves that there do exist other, quite different ways of expressing the ideas embodied in "Print Shop." The Court rejects defendant's contention that

the idea and expression of "Print Shop" are indistinguishable from one another.

### 2. Case authority regarding computer software.

Two reported cases involving the alleged infringement of computer software offer valuable guidance in the present case. Specifically, defendant cites *Synercom Technology, Inc. v. University Computer Co.*, 462 F.Supp. 1003 (N.D.Tex.1978), for the proposition that only the literal aspects of a computer program (the source and object codes) are protected under the copyright laws, and that nonliteral aspects, such as the user interface, are not protected. At the same time, plaintiffs argue that *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222 (3d Cir. 1986), requires the opposite conclusion— that the user interface of a computer program *can* be protected. A brief examination of these two cases is in order.

In *Synercom*, the plaintiff contended that the defendant had copied the "input formats" used in plaintiff's computer program, which was designed to solve engineering problems incident to structural analysis. The input formats in *Synercom* appear to have served essentially the same function as the menu screens in "Print Shop" and "Printmaster," i.e., through the placement of lines, shaded art, and text, these formats told the user what type of data to enter, where to place them and how to do it. *Synercom*, 462 F.Supp. at 1012. The plaintiff in *Synercom* argued that the sequencing and organization of data inherent in the input formats constituted an expression of the idea underlying the formats and, therefore, that the formats were protected. Judge Higginbotham was not persuaded; he responded with the question, "If sequencing and ordering is expression, what separable idea is expressed?" *Id.* at 1013. Finding no such separable idea, he went on to hold that the idea underlying the input formats and the expression of that idea were indistinguishable, thus disqualifying the formats for copyright protection.

■ In *Whelan,* the Third Circuit was faced with a similar situation. There, the plaintiff held the copyright to a computer program designed to aid the administration of dental prosthetics laboratories. The plaintiff in *Whelan* argued that the overall structure and organization of the copyrighted program, and not just the source and object codes, were protected. After thoroughly canvassing the case authority and the legislative history of the Copyright Act of 1976, the Court of Appeals held that the overall structure, sequencing, and organization of the program could be distinguished from the idea underlying the program, and that the former constituted expression of the latter. *Whelan,* 797 F.2d at 1224 n. 1, 1240. *Whelan* thus stands for the proposition that copyright protection is not limited to the literal aspects of a computer program, but rather that it extends to the overall structure of a program, including its audiovisual displays.

The *Whelan* court explicitly acknowledged the conflict between its conclusion and the conclusion of the *Synercom* court. *Id.* at 1240–41 ("Our solution may put us at odds with Judge * * * Higginbotham's scholarly opinion"). The *Whelan* court opined that *Synercom* may have been based in large part on the premise that there exists a difference between the copyrightability of sequence and form in the context of computer software and the copyrightability of sequence and form in other contexts. *Id.* at 1241. The Court of Appeals found fault with this premise, stating that "Congress intended sequencing and ordering to be protectible in the appropriate circumstances, * * * and the computer field is not an exception to this general rule." *Id.* (citation omitted).

As for Judge Higginbotham's question implying the need for some "separable idea," the *Whelan* court answered it by stating that the separable idea of the dental lab program was the efficient organization of a dental laboratory, which could be expressed in a variety of ways through a variety of computer program structures. Likewise, in the present case, the separable idea of "Print Shop" is the creation of greeting cards, banners, posters and signs that contain infinitely variable combinations of text, graphics, and borders. A rival software publisher is completely free to market a program with the same underlying idea, but it must express the idea through a substantially different structure. That "Stickybear Printer" shares the basic idea of "Print Shop" and yet expresses it through a different structure disproves defendant's contention that it was incapable of conceiving another form of expression.

■ Notwithstanding Judge Higginbotham's excellent opinion in *Synercom,* this Court is persuaded by the reasoning of *Whelan.* Applied to the facts of the present case, *Whelan* compels the rejection of defendant's argument that the overall structure, sequencing, and arrangement of screens in "Print Shop" fall outside the ambit of copyright protection.

### 3. *Mechanical or utilitarian constraints.*

■ Defendant also argues that the audiovisual displays of "Print Shop" are ineligible for copyright protection because they do not fall within the definition of "pictorial" or "graphic" works in 17 U.S.C. § 101 (1977), which states in pertinent part:

[T]he design of a useful article * * * shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

Put another way, copyright protection extends only to the artistic aspects, and not the mechanical or utilitarian features, of a protected work. *Durham Industries, Inc. v. Tomy Corp.,* 630 F.2d 905, 913 (2d Cir. 1980). In *Durham,* the counterclaimant held copyrights to two mechanically-operated children's games featuring Walt Disney characters. The counterclaimant conceded that the "decoration" of the alleged infringer's games was "entirely different" from that of its own games. *Id.* at 914.

The court held that the counterclaimant had failed to specify any "aesthetic elements" of the games that could be identified separately from and exist independently of the utilitarian aspects of the work. The shapes, dimensions, and configurations of the toys were dictated "primarily by utilitarian considerations." *Id.* at 915.

■ In the present case, it is clear that the structure, sequence, and layout of the audiovisual displays in "Print Shop" were dictated primarily by artistic and aesthetic considerations, and not by utilitarian or mechanical ones. Repeatedly, the testimony of David Balsam showed that, in creating the screens of "Print Shop," he based textual and graphic decisions on the basis of aesthetic and artistic preferences. On the "Now Type Your Message" screen of "Print Shop," for instance, no mechanical or practical constraint forced Balsam to make the "Stencil" typeface smaller on the display than the "Alexia" typeface. The choice was purely arbitrary. On the "Choose a Font" screen, no mechanical or practical factor compelled Balsam to use those exact words ("Choose a Font"). He could have written, "Select a Font," or "Indicate a Typeface Preference," or "Which Type Style Do You Prefer," or any combination of these terms. Another example is the "Screen Magic" function—Balsam considered calling this "See Animation." He could have called it "Kaleidoscope." The bottom line is that the designer of any program that performed the same functions as "Print Shop" had available a wide range of expression governed predominantly by artistic and not utilitarian considerations. Thus, the Court cannot accept defendant's argument that the audiovisual displays of "Print Shop" fall outside the scope of "pictorial" or "graphic" works as set forth in § 101.

### 4. *The "rules and instructions" doctrine.*

■ Defendant's next argument is that courts have established a separate doctrine under which rules and instructions for unprotected games or processes cannot themselves be protected under the copyright laws. Defendant further argues that this "rules and instructions" doctrine applies to the menu screens of "Print Shop," requiring the conclusion that such screens are ineligible for copyright protection. In support of this argument, defendant cites *Affiliated Hospital Products, Inc. v. Merdel Game Manufacturing Co.,* 513 F.2d 1183 (2d Cir.1975), and *Decorative Aides Corp. v. Staple Sewing Aides Corp.,* 497 F.Supp. 154 (S.D.N.Y.1980).

The rationale that underlies *Affiliated Hospital* and *Decorative Aides* is that, in cases where an idea can be expressed in only a very limited number of ways, affording copyright protection to the rules or instructions would be tantamount to affording copyright protection to the games or processes themselves. *Id.* at 158, quoting *Morrisey v. Procter & Gamble Co.,* 379 F.2d 675, 678–79 (1st Cir.1967). In the present case, the Court has already noted that the existence of "Stickybear Printer" disproves defendant's argument that there are a very limited number of ways to express the idea underlying "Print Shop." Thus, there is no danger in the present case that affording copyright protection to the "instructions" of "Print Shop" will amount to awarding plaintiff a monopoly over the idea of a menu-driven program that prints greeting cards, banners, signs and posters.

Defendant's argument is unavailing for another important reason. The menu screens in "Print Shop" contain much more than just instructions on how to operate the program. Their artwork is aesthetically pleasing. Their layout and sequence, viewed as part of a total user interface, provides a significant element of entertainment for the user (often a child). Because the menu screens contain "stylistic creativity above and beyond the bare expression" of rules or instructions, *cf. Synercom,* 462 F.Supp. at 1014, they do not fall within the holdings of *Affiliated Hospital* and *Decorative Aides.*

## B. Did defendant copy plaintiffs' work?

Having determined that the overall structure, sequence and arrangement of the screens, text, and artwork (i.e., the audiovisual displays in general) are protected under the copyright laws, the Court now turns to the question of whether defendant in fact copied protected portions of "Print Shop."

### 1. Display of copyright notice.

■ Before reaching the merits of the copying issue, however, one preliminary matter must be disposed of. Defendant contends that plaintiff's copyright notice fails to provide reasonable warning to others that the audiovisual displays, and not just the literal aspects of the program, are copyrighted. Title 17 U.S.C. § 401(c) (1977) states, in pertinent part, "The notice shall be affixed to the copies in such manner and location as to give reasonable notice of the claim of copyright." The only copyright notice in "Print Shop" appears on the initial, or "boot up," screen. That notice generally states that Pixellite Software claims copyright protection over "Print Shop"; it does not specify the particular aspects of the program over which protection is claimed.

The Court finds that plaintiffs' display of the copyright notice provided defendant with reasonable warning that the audiovisual displays in "Print Shop" were copyrighted. The general notice that appears on the "boot up" screen implies that the copyright holder claims protection for as much of the work as is allowable under the copyright laws. It would be unreasonable to expect copyright holders to list on each copy of their works every single aspect or element of the work for which they claim protection. It would also be unreasonable to expect copyright holders to know at any given time the exact state of the law on the scope of copyright protection. Plaintiffs' copyright notice was adequate.

### 2. Direct evidence of copying.

■ The Court now reaches the core issue of whether defendant copied plaintiffs' work. Because direct evidence of copying is rarely available, copying may be established by proof of access and substantial similarity. *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir.1970). The present case is exceptional in this regard. Plaintiffs produced sufficient direct evidence of copying to establish infringement.

The uncontradicted testimony at trial was that both Hong Lu and David Lodge ordered Unison's programmers, MacDuff Hughes in particular, to copy "Print Shop." The programmers evidently executed these orders to the best of their ability. Some of the copying was done so carelessly that it left unmistakable traces. For example, in the "Custom Layout" screen of "Print Shop," the user is instructed to press the "Return" key on the Apple keyboard. Similarly, in the "Custom Layout" screen of "Printmaster," the user is instructed to press the "Return" key on the IBM keyboard. Actually, the IBM keyboard contains no "Return" key, only an "Enter" key. Lodge admitted that Unison's failure to change "Return" to "Enter" was a result of its programmers' intense concentration on copying "Print Shop."

The testimony of Hughes also provided probative direct evidence of copying. Even after negotiations with Broderbund had collapsed and Lu had told Hughes not to feel as if he any longer had to produce an exact copy of "Print Shop," Hughes finished the portions that he had been copying and kept them. He was hurrying to finish the project so that he could get back to school on time. In particular, Hughes copied the screens in the "Greeting Card," "Sign," and "Picture Editor" functions. Hughes even had an idea for a totally different user interface in the "Picture Editor" function, but he copied the "Print Shop" interface because his copied version of the interface was "much further along."

Based on the foregoing, the Court finds that plaintiffs have adduced sufficient direct evidence of copying to prove infringement of the protected portions of "Print Shop."

### 3. *Access.*

In the interest of creating a comprehensive record, the Court deems it desirable also to undertake a circumstantial analysis of copying, i.e., a determination of whether defendant had access to the copyrighted work and whether there exists "substantial similarity" between the copyrighted work and defendant's work. *See Sid & Marty Krofft Television Productions, Inc. v. Mc-Donald's Corp.,* 562 F.2d 1157, 1162 (9th Cir.1977).

There is no question but that defendant had access to the copyrighted work. David Balsam gave Hong Lu several commercially-available copies of "Print Shop" for the purpose of representing to Japanese firms that Unison could do conversions of "Print Shop" for them. Hughes, the Unison programmer, used a copy of "Print Shop" as a model for the IBM version that he was ordered to create. Although the Court finds that Unison did not have access to the source or object code to "Print Shop," the uncontradicted testimony was that access to the literal aspects of the program were not necessary to copy "Print Shop." Plaintiff has proven that defendant had access to the protected work.

### 4. *Substantial similarity.*

The leading case in this area is *Arnstein v. Porter,* 154 F.2d 464 (2d Cir.1946), *cert. denied,* 330 U.S. 851, 67 S.Ct. 1096, 91 L.Ed. 1294 (1947). There, the court established a two-step test for determining substantial similarity. In *Krofft,* 562 F.2d at 1164–65, the Ninth Circuit, albeit with some modification, adopted the *Arnstein* test and interpreted it to require the application of (1) an "extrinsic" test aimed at determining whether there exists a substantial similarity in underlying ideas; and (2) an "intrinsic" test to ascertain whether there exists a substantial similarity in the expression of the underlying idea. "Analytic dissection" and expert testimony are admissible to prove similarity under the extrinsic test, but the intrinsic test consists solely of the response of the "ordinary reasonable person." *Id.* at 1164. Thus, under *Krofft,* neither analytic dissection nor expert testi-mony is appropriate in applying the intrinsic test.

In *Whelan,* 797 F.2d at 1233–35, the Third Circuit joined the "growing number of courts" that have abandoned the bifurcated test of substantial similarity in complex copyright actions, such as those involving computer programs. In its place, the *Whelan* court adopted an integrated substantial similarity test pursuant to which both lay and expert testimony would be admissible. *Id.* The *Whelan* court did not say whether analytical dissection (the side-by-side comparison of each element of the copyrighted and allegedly infringing works) would be appropriate under its integrated test. Although this Court is of the opinion that an integrated test involving expert testimony and analytic dissection may well be the wave of the future in this area, the Ninth Circuit's position is clearly marked out in *Krofft,* and controls the analysis herein.

### (a) *Application of the extrinsic test.*

As stated above, the extrinsic test is aimed at determining whether there exists a substantial similarity between the underlying ideas of the copyrighted and allegedly infringing works. There is no question but that "Print Shop" and "Printmaster" share the same underlying idea. Plaintiffs' expert, Lawrence Tesler, who is Acting Manager of the Advanced Development Group at Apple Computer, stated that the idea behind "Printmaster" was exactly the same as the idea behind "Print Shop." One of defendant's experts, Peter Antoniak, who is a software consultant, stated that "Printmaster" and "Print Shop" do almost the same thing—they provide the user with an output. Expert opinion notwithstanding, it is obvious that the purpose and uses of "Printmaster" and "Print Shop" are virtually identical. Both programs allow their users to create greeting cards, signs, banners and posters with various, user-selected combinations of text, graphics, and borders. Both operate in conjunction with dot-matrix printers. The application of the extrinsic test enunciated in *Krofft* to the pro-

grams at issue in this case clearly compels a finding of substantial similarity of ideas.

(b) *Application of the intrinsic test.*

In applying the intrinsic test, the finder of fact (in this case the Court) is to determine whether an "ordinary reasonable person" would find the expression of the subject works to be substantially similar. *Krofft*, 562 F.2d at 1164. The question is whether the infringing work captures the "total concept and feel" of the protected work. *Id.* at 1167, quoting *Roth Greeting Cards*, 429 F.2d at 1110. Having viewed both programs at trial, the Court finds that an ordinary reasonable person would think the expression of "Print Shop" and "Printmaster" substantially similar.

The ordinary observer could hardly avoid being struck by the eerie resemblance between the screens of the two programs. In general, the sequence of the screens and the choices presented, the layout of the screens, and the method of feedback to the user are all substantially similar. Specifically, the following similarities exist, *inter alia:* the structures of the "Main Menu" screens; the "staggered" layout of 3-2-3-2-3, totaling thirteen graphics; the "tiled" layout of 5 x 7 in both programs; the second screen in the "Custom Layout" function, in which the word "place" is highlighted and the word "remove" is inversely highlighted in both programs; the fact that the "tiled" option disappears in both programs in the medium-size graphic mode; the use of only left and right arrow keys on both keyboards, despite the fact that the IBM keyboard has up and down arrow capability; the offering in both programs of only three types of lines (solid, outline, and three-dimensional); and the fact that both programs require the user to create the front of the printed product before creating the inside of it. Other similarities are too numerous to list.

Mere lists of similarities cannot adequately convey the impression of overall similarity between "Print Shop" and "Printmaster." No ordinary observer could reasonably conclude that the expression of the ideas underlying these two pro-

grams were not substantially similar. Put simply, "Printmaster" looks like a copy of "Print Shop," with a few embellishments scattered about in no particular order. The "total concept and feel" of these programs, *Krofft*, 562 F.2d at 1167, is virtually identical. The application of the intrinsic test in the present case compels the finding that their expression is substantially similar.

C. *Equitable defenses.*

Defendant asserts two affirmative defenses, both of which call upon the Court's equitable powers. First, defendant argues that plaintiffs are estopped to claim infringement because they knew defendant was copying "Print Shop," and because plaintiffs even encouraged such copying. Second, defendant contends that plaintiffs should be denied recourse to the Court's equitable powers because plaintiffs themselves unlawfully copied a portion of the audiovisual displays of "Print Shop."

1. *Estoppel.*

The law of equitable estoppel in the Ninth Circuit was set forth in *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.1960). Four elements must be present to establish the defense of estoppel: (1) the party to be estopped must have known the facts; (2) the party to be estopped must have intended that his conduct would be acted on, or the party asserting the estoppel must have had a right to believe that the other party harbored such an intention; (3) the party asserting the estoppel must have been ignorant of the true facts; and (4) the asserting party must have relied to his detriment on the other party's conduct.

▮ Estoppel does not apply in the present case because the first element is lacking. Although Broderbund was told that Unison planned to release an IBM-operable program that would perform the same functions as "Print Shop," Broderbund never knew that this product would be the "Print Shop" copy that Unison had been working on during the negotiations. If Broderbund had known that Unison intended to market an IBM version of "Print

Shop" whether or not the parties could agree on a conversion or licensing agreement, Broderbund never would have encouraged Unison to develop an exact copy of "Print Shop." Because Broderbund did not have knowledge of the critical fact (Unison's intention to market its copy of "Print Shop"), the equitable defense of estoppel cannot be asserted herein.

### 2. *Unclean hands.*

 Defendant next argues that plaintiffs should be barred from recovering because they infringed someone else's copyright in the course of creating "Print Shop." Martin Kahn testified that he referred to the Letraset catalog, which is copyrighted, while designing the typefaces in "Print Shop." Even assuming that plaintiffs infringed Letraset's copyright with regard to one or more of its typefaces, however, Unison is still not entitled to assert the defense of unclean hands in the present case.

The defense of unclean hands may be asserted in a copyright infringement action only where the defendant can show that he has personally been injured by the plaintiff's conduct. *See Mitchell Brothers Film Group v. Cinema Adult Theater,* 604 F.2d 852, 863 (5th Cir.1979). In the case at bar, Unison has failed to demonstrate any such injury. Far from being injured by the alleged infringement of Letraset's copyright, defendant may have profited from it. If the use of Letraset's typefaces contributed at all to the popularity and success of "Print Shop," then Unison benefited from Broderbund's use of the typefaces because any sales of "Printmaster" were based on the popularity of "Print Shop." Defendant's assertion of the unclean hands defense fails.

 Finally, defendant advances an argument separate from, but related to, the unclean hands defense. Specifically, defendant argues that its proffer of evidence on the Letraset issue rebuts the presumption that plaintiffs' copyright is valid. The Court cannot agree. Again assuming that plaintiffs unlawfully copied some or all of the "Print Shop" typefaces from Letraset, these typefaces comprise such a miniscule portion of the total audiovisual displays that the overall originality of "Print Shop" cannot be deemed disproven. The court in *Midway Manufacturing Co. v. Bandai-America, Inc.,* 546 F.Supp. 125, 140 (D.N.J. 1982), noted that finding rebuttal of the validity of a plaintiff's copyright amounts to awarding judgment to the defendant, no matter how egregious the defendant's conduct. Recognizing the potential harshness and inequity inherent in this rule, the *Midway* court went on to say that if a plaintiff has incorporated some copying into a largely original work, the plaintiff will be entitled to copyright protection as to those elements. *Id.* at 140 n. 9 (citation omitted).

The Court finds that the attractiveness or consumer appeal of the typefaces in "Print Shop" amount to an extremely small portion of the overall audiovisual displays. The success of "Print Shop" is mainly attributable to the structure, sequence and arrangement of its text, artwork, and user inputs. Under these circumstances, it cannot be said that any copying by plaintiffs of Letraset typefaces detracts from or disproves the basic originality of "Print Shop." Defendant has failed to rebut the presumptive validity of plaintiffs' copyright.

### III

For the foregoing reasons, and good cause appearing therefor,

IT IS HEREBY ORDERED that:

1. Defendant, Unison World, Inc., is adjudged to have infringed the copyright of plaintiff, Pixellite Software, on the audiovisual displays of the computer program known as "Print Shop".

2. The parties shall appear for a status conference on October 30, 1986, at 2:00 p.m., to discuss, *inter alia,* the disposition of the severed portions of this action.