**MANUFACTURERS TECHNOLOGIES, INC., Plaintiff,**

v.

**CAMS, INC., Edward D. Cormier, Kenneth J. Laviana, and Norman St. Martin, Defendants.**

**Civ. No. N–85–253 (TFGD).**

United States District Court, D. Connecticut.

Jan. 30, 1989.

Donald Holland and Malcom Chisholm, Jr., Springfield, Mass., for plaintiff.

Donald Hayes, Hartford, Conn., and William Reinsmith, for defendants.

## MEMORANDUM OF DECISION

DALY, District Judge.

Plaintiff, Manufacturers Technologies, Inc., has brought this action against defendants Cams, Inc., Edward Cormier, Kenneth Laviana, and Norman St. Martin alleging copyright infringement, breach of fiduciary duty, and unfair trade practices in connection with the creation and sale of various computer software programs. This matter was tried before the Court during four days commencing October 17, 1988. The Court having bifurcated this matter, this decision shall only address the theories of liability at issue, reserving for the future the question of what, if any, damages should follow from this decision.

### FINDINGS OF FACT

Plaintiff, Manufacturers Technologies, Inc. ("MTI"), is a Massachusetts corporation having its principal place of business in Springfield, Massachusetts. Its incorporator, president, and controlling stockholder is Thomas Charkiewicz. Defendant, Cams, Inc. ("CAMS"), is a Connecticut corporation having its principal place of business in Waterbury, Connecticut. Defendants Kenneth Laviana and Edward Cormier are the key principals and owners of CAMS and respectively serve as its vice president and president. Defendant Norman St. Martin is president of Chempro Data Services Corp., a subsidiary of NSM Corp., a Massachusetts corporation having its principal place of business in Westfield, Massachusetts.

Charkiewicz is experienced in the fields of machining, process and manufacturing engineering, computer-aided design and manufacturing ("CAD/CAM"), and computer-aided cost estimating. Defendant Laviana is experienced in the fields of metalworking, manufacturing engineering, computer numerical controlled programming, and computer-aided cost estimating. Defendant St. Martin is experienced in the fields of engineering and computer programming including computer-aided manufacturing. However, the extent of his computer programming experience, is subject

to some dispute.[1] Defendant Cormier is experienced in sales and marketing of technical products but has no significant experience or knowledge in the creation or development of computer programming or cost estimating.

"COSTIMATOR" is a computer software program developed in 1982 and 1983 by Thomas Charkiewicz and Rene Laviolette for MTI. Approximately 3000 man hours were expended in developing the original program. It is designed to enable the user to estimate the cost of machining a manufactured part through computer application, as opposed to manual calculation. Plaintiff obtained copyright registrations for COSTIMATOR program versions 01.00, 01.01, 01.03, and 01.04 as follows:

| Version | Copyright Reg. No. | Effective Date |
|---|---|---|
| 01.00 | TX–1–544–052 | April 22, 1985 |
| 01.01 | TX–1–544–053 | April 22, 1985 |
| 01.03 | TX–1–544–054 | April 22, 1985 |
| 01.04 | TX–1–544–055 | April 22, 1985 |

Plaintiff has also obtained copyright registrations for selected screen displays and for the user's manual of COSTIMATOR version 01.00. They are as follows:

| Version | Copyright Reg. No. | Effective Date |
|---|---|---|
| 01.00 | TX–1–737–903(screens) | January 30, 1986 |
| 01.00 | TX–1–808–645(manual) | May 12, 1986 [2] |

From December 5, 1983 through May 22, 1984, Defendants Cormier and Laviana (and thereby defendant CAMS through its principals) acted as MTI sales representatives attempting to sell the COSTIMATOR program in Connecticut. During December 1983, at the invitation of MTI defendant Cormier attended a demonstration of the COSTIMATOR program held at Wang Computers' offices in Farmington, Connect-

icut. At this demonstration, Cormier admitted viewing the exhibition of COSTIMATOR program version 01.00 and seeing selected COSTIMATOR screen displays. While at WANG, Cormier had the opportunity to take photographs of COSTIMATOR screen displays. However, he denied taking photographs of the screen displays, and states that instead he photographed visitors at the exhibition to be used in marketing the COSTIMATOR program. Defendant Cormier also viewed COSTIMATOR screen displays while present at a customer demonstration for the Wheeler Group in April of 1984. Defendant Laviana saw a brief display of the COSTIMATOR program at a trade show during 1985.

As MTI sales representatives, defendants Cormier and Laviana were given access to a variety of promotional materials prepared by MTI for distribution to prospects. For example, in early 1984 defendant Cormier ordered, presumably for distribution to prospects, COSTIMATOR brochures and a COSTIMATOR price quote package, containing a variety of product literature including sample screen displays. Defendants Cormier and Laviana also were given some sales and technical training by MTI to familiarize them with the product they were selling. Furthermore, defendants CAMS and Cormier obtained access to one or more COSTIMATOR user's manuals.[3]

In April 1983, defendant St. Martin met MTI's Charkiewicz at MTI's offices in Springfield, Massachusetts on a business

---

1. At the hearing on plaintiff's request for a preliminary injunction, defendant St. Martin testified that he has written many programs, including the alleged infringing program at issue. However, at trial St. Martin testified that he only created the "screens and flow" of the defendants' computer programs at issue and that the "code" was written by Al Korostynski.

2. The copyright registration for the user's manual was subsequently supplemented and given a new registration number, TX–1–857–205, effective July 31, 1986.

3. Defendant Cormier testified that when litigation commenced and the defendants were trying to acquire information about the nature of the claim against them, he contacted a sales prospect, Parts Maker Inc. of New Jersey, and asked

them to send him a copy of the COSTIMATOR user's manual, which they did. However, he denies ever examining or opening this manual and stated that at the direction of counsel he turned the package over to counsel where it has been kept for safekeeping. Given defendants' failure to put on any evidence verifying this story (e.g. such as who specifically sent this manual, when it was received, and how Cormier knew that Parts Maker had such a manual), their credibility problems on other key aspects of testimony, and Rossow's testimony that it was MTI's standard practice to give COSTIMATOR user manuals to sales representatives, the Court refuses to credit Cormier's testimony on this point.

call. Charkiewicz gave St. Martin a demonstration of the COSTIMATOR program version 01.00 and its screen displays as they appeared at that stage of development. No program source code was seen by St. Martin. St. Martin also found in his office a flyer entitled COSTIMATOR 123+ and other promotional materials which describe an unspecified version of COSTIMATOR, including a packet of materials called "THE SYSTEM" which shows COSTIMATOR screen displays and explains their functions.[4] These materials do not contain a copyright notice. While St. Martin testified that neither he nor his employees saw these materials while writing "QUICK COST" ("QC") III, V, and X or its RAPIDCOST counterparts[5] and that these materials were found in his office after the plaintiff filed suit, the Court does not find this testimony credible in light of the fact that the defendants failed to offer any explanation as to how and when these materials came into St. Martin's hands.[6] Furthermore, in August 1985, defendant St. Martin filled out a "bingo card" in a machining trade publication requesting that MTI send him information on COSTIMATOR. No proof was submitted that indicated whether or not in fact this promotional brochure was actually sent to or received by defendant St. Martin.

In January or February 1984, St. Martin and Cormier and Laviana, as representatives of CAMS, agreed to work together to develop data-based cost-estimating computer programs for the metalworking field. Defendant Cormier told St. Martin about his (and presumably CAMS') association with MTI at the time they began their joint effort. They began formulating the new programs as early as March or April of 1984. The defendants testified that the starting point for their efforts was a computer program, entitled QCI, written by defendant Laviana prior to his association with MTI. QCI differs from COSTIMATOR and the programs later developed by the defendants in that it was not a data base program, i.e., a program that allows the user to access within the program itself a variety of technical materials and data incorporated into the program's logic and analysis which one would otherwise have to provide on one's own or by reference to some type of data compilation. Furthermore, the screen displays in QCI differ from those of QC III, V, and X and RAPIDCOST. The revision of QCI played a limited role in the development of QC III, V, and X, and RAPIDCOST 1, 2, and 3.[7]

Despite the fact that defendants Laviana, Cormier, and CAMS were preparing to compete with MTI as early as January 1984, they made no effort to notify CAMS of this fact until May 22, 1984. In a letter addressed to "Tom Charkiewicz" on that date, defendant Cormier notified MTI that CAMS, Laviana, and he were terminating their sales relationship with MTI because

---

**4.** Plaintiff alleges that these materials were an early version of a very limited publication of unpublished user's manual given to defendant Laviana presumably as part of his sales and technical training. However, plaintiff failed to question Laviana on this point. When later officially published, the user's manual did contain a copyright notice.

**5.** QC III, V, and X and RAPIDCOST 1, 2, and 3 are the allegedly infringing computer cost-estimating programs, designed and distributed by the defendants, which are at the heart of this controversy.

**6.** Defendant St. Martin's testimony contains a number of irregularities which the Court finds troubling. For example, at the preliminary injunction hearing St. Martin testified that he had a "doctorate in business." However, at trial his testimony indicated that the doctorate in business was received from "Pacific Southern" through challenge exams and life experience testing administered via mail order and that he never physically attended Pacific Southern. Furthermore, in advertising his business in Micro Marketworld magazine in November 1984 defendant St. Martin listed that Chempro Data Services Corp. employed forty persons. In testimony at trial, St. Martin indicated that in fact he only had one employee but listed forty because at that time he was considering investing in a forty employee firm. This list is not intended to be exhaustive.

**7.** RAPIDCOST 1, 2, and 3 are programs very similar, if not exactly identical, to the QC III, V, and X programs. The only real difference is that RAPIDCOST is marketed and sold by St. Martin and Chempro Data Sciences while QC III, V, and X are sold and marketed by CAMS and Cormier and Laviana under a license agreement with the copyright holder, St. Martin.

they planned to upgrade QCI and market a "K–Mart Cost Estimator rather than a Cadillac [namely COSTIMATOR]...." Furthermore, defendant Cormier incorrectly stated in that letter that "Ken [Laviana] and I thought it only right to alert you as soon as this decision was made so that no misunderstanding will result." Finally, despite his prior testimony that for all practical purposes the sales representation ended in February 1984, on March 12, 1984 defendant Cormier placed an order for and thereafter was sent 200 COSTIMATOR flyers.

The product of the defendants' efforts were the cost estimating programs QC III, V, and X, and RAPIDCOST 1, 2, and 3. Defendant St. Martin testified that approximately 1500 hours were expended developing these programs. They were developed primarily by defendant St. Martin with the assistance of defendant Laviana. In February 1985, St. Martin obtained copyright registrations for QC and RAPIDCOST.[8] St. Martin did not write the source code. When the new programs were written, the defendants had in their possession a COSTIMATOR brochure, devoid of any copyright notices, containing pictures of seven COSTIMATOR screen displays. Shortly after this suit was filed an impoundment order was issued by the Court which was executed at defendant Laviana's residence on July 8, 1985. There MTI's Rene Laviolette found taped together copies of a series of COSTIMATOR and QC V screen displays with notations and checkmarks indicating similarities between the two. These displays raise an inference of copying which defendants have failed to rebut.

The Court will address in detail later the degree of similarity between the COSTIMATOR and QC programs (III, V, and X)[9],

as indicated in their screen displays. Plaintiff's COSTIMATOR program currently sells for approximately $20,000.00 while defendants programs sell for between $1,000 and $2,500. In advertising both the QC and RC program series, the defendants overstated their performance capabilities.

## DISCUSSION

### I. THE COPYRIGHT INFRINGEMENT CLAIMS

▮ To establish a claim for copyright infringement, the plaintiff must show ownership of a valid copyright and copying of the copyrighted material by the defendants. *See Warner Bros. v. American Broadcasting Companies*, 654 F.2d 204, 207 (2d Cir.1981) (citation omitted). To prove copying by the defendants, the plaintiff must prove that they had "access" to the copyrighted work and that the defendants' work is "substantially similar" to the plaintiff's work. *Walker v. Times Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.1986), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986).

The defendants do not contest the plaintiff's ownership of the copyrights at issue. However, the defendants do assert that the plaintiff's screen displays do not contain copyrightable subject matter and that even assuming they do, that the plaintiff has forfeited its right to the screen display copyrights.

### A) *The Copyrightability of Computer Screen Displays*

Whether a copyright in a computer program extends to its screen displays has been the subject of some confusion and disagreement. Part of this confusion was relieved by a recent decision of the Copy-

---

**8.** QUICK COST

Effective Date: February 25, 1985
Title of Work: QUICK COST
Alternate Titles: QUICK COST 1; 2; 3; 2D; and 3D
Nature: Text of computer program
Registration No.: TX–1–564–058
RAPID COST
Effective Date: February 25, 1985
Title of Work: RAPIDCOST

Alternate Titles: RAPIDCOST 1; 2; 3; 2D; and 3D
Registration No.: TX–1–564–057

**9.** As the parties did at trial and in post-trial briefing, the Court will treat the RAPIDCOST and QUICK COST program lines as being different in name only. Therefore, in discussing the similarity issue, the Court will only discuss COSTIMATOR and QUICK COST and not RAPIDCOST.

right Office which stated that a single copyright registration of a computer program extends copyright protection not only to the literal elements of the program—its source and object codes [10]—but also to the screen displays it generates to the extent that they contain original creative authorship. 36 Pat. Trademark & Copyright J. (BNA) 155 (1988). While the Copyright Office emphasized that this decision was simply a reaffirmation of its long-standing policy, it recognized that confusion may have arisen from its concurrent acceptance of separate registrations of screen displays. It no longer accepts such separate registrations.[11]

■ While this confusion existed and in an apparent abundance of caution, the plaintiff registered both its computer programs and selected screen displays in the separate registrations noted earlier. These registrations constitute *prima facie* evidence of the validity of the copyright works covered thereby, *see* 17 U.S.C. § 410(c), and

shift to the defendants the burden of producing evidence showing that the registered works are not copyrightable. 3 *Nimmer on Copyright*, §§ 12.11[A], [B] at 12–80.3–12–80.4 (1988) [hereafter "Nimmer"]; *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir.1986); *Eckes v. Card Prices Update*, 736 F.2d 859, 861 (2d Cir.1984).

Recognizing their burden, the defendants argue on several different grounds that plaintiff's screen displays do not contain copyrightable subject-matter. These arguments raise issues novel to this district and circuit which courts have only just begun to confront and which grow out of the fact that two different computer programs, whose source codes were created independently of one another, can produce computer screen displays which are very similar, if not totally alike. While other courts have considered the scope of copyright protection of a computer program copyright [12],

---

**10.** The definitions of these computer terms are set out in "Copyright Office Practice for Computer Programs (from Compendium II)."

321.01 *Source code.* Source code is the computer program code as the programmer writes it, using a particular programming language, generally written in a high-level language, such as BASIC, COBOL, or FORTRAN. A program in source code must be changed into object code before the computer can execute it

. . . .

321.02 *Object code.* Object code is the representation of the program in machine language (e.g., using binary coding zeroes and ones or hexadecimal coding using letters and numbers or octal code using 0 and 7) which the computer executes.

**11.** The Copyright Office notes that this refusal does not impinge on the validity of prior separate registrations of computer programs and screen displays. 36 Pat. Trademark & Copyright J. (BNA) at 155.

**12.** To generalize broadly, courts examining this issue have fallen into two schools of thought. The first, favoring broad protection, has determined that the copyright in a computer program extends not only to the program's literal elements, the source and object code, but also to the "structure, sequence, and organization" of the program which may include the screen displays. *See Whelan Associates v. Jaslow Dental Laboratory*, 797 F.2d 1222 (3d Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987) (despite lack of evidence of direct source code copying, copyright infringement

found because protection extends to structure, sequence, and organization of program); *Digital Communication Associates v. Softklone Distributing Corp.*, 659 F.Supp. 449 (N.D.Ga.1987) (copyright protection in computer program does not extend to its screen displays but separate copyright in "status screen" was infringed where defendant's status screen captures "total concept and feel" of plaintiff's); *Broderbund Software, Inc. v. Unison World*, 648 F.Supp. 1127 (N.D.Cal. 1986) (extending *Whelan*, copyright protection in a computer program extends beyond source codes to the structure of plaintiff's programs including its audiovisual screen displays); *SAS Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F.Supp. 816 (M.D.Tenn.1985) (implies that expropriation of design and structure of plaintiff's program, regardless of source code copying, is an infringement of plaintiff's program). The second school of thought favors withholding copyright protection for a program's user interface and/or structure, sequence and organization, classifying those program elements as uncopyrightable ideas or functional imperatives. *See Plains Cotton Cooperative v. Goodpasture Computer Service*, 807 F.2d 1256 (5th Cir. 1987), *cert. denied*, — U.S. —, 108 S.Ct. 80, 98 L.Ed.2d 42 (1987) (where market factors played a significant role in determining the sequence and organization of software, organizational similarity between the plaintiff's and defendant's programs is not sufficient to constitute infringement of plaintiff's computer program); *Softklone*, 659 F.Supp. 449; *Q–Co. Industries, Inc. v. Hoffman*, 625 F.Supp. 608 (S.D.N.Y.1985)

only two courts have specifically dealt with the issue of whether the copyright in a computer program should extend protection to the screen displays generated by that program. The first of these cases, *Broderbund Software, Inc. v. Unison World*, 648 F.Supp. 1127, 1132 (N.D.Cal. 1986), took a very broad view. It held that the copyright in a computer program extends beyond the literal program codes to the structures of that program including its audiovisual displays. However, in reaching this conclusion, the court appears to have misinterpreted the Third Circuit's holding in *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222 (3d Cir.1986). In *Whelan*, the Third Circuit held that the copyright in a computer program protects the structure, sequence, and organization of that program even in the absence of direct source or object code copying. 797 F.2d at 1233. The *Broderbund* court extended the reach of *Whelan* by equating computer program copyright protection for the structure, sequence, and organization of a program with protection of the screen outputs. 648 F.Supp. at 1133. However, the *Whelan* court said only that, as an evidentiary matter, that screen outputs could be indirect and inferential evidence useful in establishing copying of the underlying computer program.[13] 797 F.2d at 1244. The *Broderbund* court sought to determine the protectible expressive aspects of the screen displays at issue by referring to the idea of the computer program at issue. 648 F.Supp. at 1132. Specifically, it held that because a unique third computer program (not at issue in the suit) existed, which like defendants and plaintiffs programs "allow[ed] its users to print greeting cards, signs, banners, and posters," there existed expression embodied in the menu screens separable from the idea of the plaintiff's

program. *Id.* In doing so, it overextended the scope of scope of copyright protection applicable to those screen displays.

In *Digital Communication Associates, Inc. v. Softklone Distributing Corp.*, 659 F.Supp. 449 (N.D.Ga.1987), the court adopted a different and more narrowly focused approach. It rejected the idea that the copyright in a computer program extended copyright protection to the screen displays of that program. *Id.* at 455. Noting that the same screen display can be created by a variety of different computer programs and is in no way a direct copy or reproduction of the programs that generates it, the court held that a case of infringement could not be made out on screen copying alone, in the absence of evidence of copying of source and object codes, as well as the structure, sequence, and organization of a program. *Id.* at 455–56. However, the court also held that a separate copyright registration of a status screen display protects the expression contained therein. *Id.* at 457. To determine the scope of that expression, the court focused on the *idea expressed in the screen display and the specific components contained therein,* which it defined as the process by which the screen operates, as opposed from its expression, the method by which that idea is communicated. *Id.* at 458.

The Copyright Office's refusal to accept separate copyright registrations of screen displays calls into doubt the validity of the first part of the *Softklone* holding because it would effectively preclude the protection of expression contained in computer screen displays, a result obviously not envisioned by the *Softklone* court. However, the Court is not persuaded that it should adopt the *Broderbund* approach and its implica-

---

(where structural similarities between plaintiff's and defendant's teleprompting programs were dictated by functional considerations, plaintiff's program did not infringe plaintiff's); *Synercom Technology, Inc. v. University Computing Co.*, 462 F.Supp. 1003 (N.D.Tex.1978) (plaintiff's sequencing of data inputs for statistical analysis program was idea, not protected copyright expression infringed by defendant's use of same data input formats).

**13.** Furthermore, as noted in *Whelan,* the third judge considering that issue was of the opinion that "screen outputs are of no probative worth in determining whether one computer program is copied from another [because] different program codes in different computer languages are capable of producing identical screen outputs." *Id.* at 1244 n. 45.

tion that computer program infringement can be shown merely by showing substantial similarity of screen outputs. Such an approach ignores the fact recognized by both the *Whelan* and *Softklone* courts that more than one computer program can produce virtually the same screen display.

The Court is therefore left with a choice between two alternatives. The Court could require the plaintiff to prove infringement of the program copyrights themselves by showing not only substantial similarity between the computer screen displays but also by showing substantial similarity in the program codes (or by showing that the portion of the program coding represented by the screen outputs was such a qualitative part of the program itself that the program was infringed). The downfall of such an approach is that if, in fact, the infringing party only reverse engineered the screen displays themselves without having had access to the source or object codes, then the plaintiff's task in showing infringement of the computer program itself, would be difficult, if not insurmountable. Such an approach would afford little, if any, protection to the expression that may be encompassed within the the user interface or screen displays of a program.

■ The second approach, and one that this Court adopts, is to treat the single registration of the computer program as accomplishing two interrelated yet distinct registrations; one of the program itself and one of the screen displays or user interface of that program, to the extent that each contains copyrightable subject matter. This approach creates the legal fiction of two separate registrations. Also, it allows the Court to build on *Softklone* by focusing on the copyrightable expression in each type of registration and avoiding the mistake of identifying a program's idea with the idea of a particular screen display or some element therein. It recognizes

that a computer program and its screen displays are, for copyright purposes, fundamentally distinct. The computer program and any authorship contained therein is designed to organize and direct the computer to efficiently perform a particular task when properly directed by the user. While the user interface is designed to communicate with the user in a way to facilitate the understanding and use of the program itself. This approach conforms to the realities of Copyright Office registration procedures.

Having set out how to treat the plaintiff's copyright registration of its computer program, the Court will summarize the defendants' arguments against copyrightability of the subject matter at issue. The defendants' first set of arguments focuses on the idea-expression dichotomy at the heart of copyright law. *See Whelan,* 797 F.2d at 1234 ("It is axiomatic that copyright does not protect ideas, but only expressions of ideas.") The defendants primary defense to the infringement claims is that the screen displays are dictated by functional considerations which so limit the manner of expressing the idea of cost-estimating that any expression of that idea is likely to be very similar, if not identical.[14] They further argue that the screen displays at issue are uncopyrightable forms necessary to the expression of the idea which convey no information to the user. The defendants' second set of arguments against copyrightability go to the requirement of originality. *See* 17 U.S.C. § 102(a) ([c]opyright protection subsists ... in original works of authorship"). Defendants argue that the column and row headings contained in plaintiff's screen displays and the facts set out therein are not original.

The screen displays and the matter contained therein are registered as "compilations."[15] Application of defendants' argu-

---

**14.** As will be apparent later, at trial the defendants did not make the mistake of simply applying the idea of the program to its screen displays, because they apply this functionality argument to many components of the plaintiff's screen displays.

**15.** A compilation is defined in 17 U.S.C. § 101 as

a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

ments to these compilations, requires a bifurcated analysis of the external and internal aspects of the screen displays themselves. Externally, plaintiff claims that the flow and sequencing of the screen displays is subject to copyright protection. While making this argument with respect to all its screens flow, the plaintiff only offered evidence on the nature of the "creating-an-estimate" screen flow, a flow which goes to the heart of the COSTIMATOR cost-estimating scheme.

The defendant has failed to rebut the presumption of copyright validity of this aspect of the screen displays. The flow of the plaintiff's screen displays reflect plaintiff's creative manner of expressing how the process of cost-estimating should be accomplished. By design, the COSTIMATOR program and its screen displays used in the creating of an estimate sequence drive the user's thought processes through a number of manufacturing and engineering decisions, thereby expediting the process of creating a cost-estimate and communicating to the user the manner in which a cost-estimate should be derived.

■ The defendants' argument that the external flow and sequencing of the screens is dictated solely by functional considerations is unpersuasive. *See Decorative Aides Corp. v. Staple Sewing Aides,* 497 F.Supp. 154, 157 (S.D.N.Y.1980), *aff'd,* 657 F.2d 262 (2d Cir.1981) (citing *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976)). In *Decorative Aides,* the court held that the similarity between the parties' diagrams and instructions for applying a "drapery header" was not actionable as infringement because functional considerations endemic to that device limited the number of ways instructions could be expressed. The same is not true here. The plaintiff's creating-an-estimate screens flow from collecting initial job information to scaling the digitizer to selecting and assigning material costs to selecting operations to process information to adding additional operations to

factoring in engineering and sales costs selections to factoring in handling costs to report generation. While there is evidence to show that some of the specific operations performed are functional in nature, there is none save defendants' expert testimony that the overall process and flow of these screens is driven solely by functional considerations. However, that same expert candidly admitted that cost-estimating is part science and part art. Also, plaintiff adduced testimony from four different expert witnesses, all experienced in cost-estimating, that the process of creating a cost-estimate is unique to the individual manually performing the estimate or the computer program and screen displays assisting in the same. Demonstrative of this point was these witnesses testimony as to their own unique prioritization, selection, and arrangement of the operations to be performed in creating a cost-estimate. *See Eckes v. Card Prices Update,* 736 F.2d 859, 862–63 (2d Cir.1984) (selection plus arrangement equals expression). Also, persuasive on this point was Joel Goldberg's testimony that his trial review of four cost-estimating software packages (one of which was COSTIMATOR) for a trade publication indicated that no two were alike. For all these reasons, the Court holds that the external sequencing and flow of plaintiff's screen displays in the creating-an-estimate sequence constitutes copyrightable expression which communicates to the user plaintiff's view of how a cost-estimate should be created.

■ There are various internal aspects of the screen displays that the plaintiff argues warrant protection. First, the Court will review those aspects common to all the screen displays for which plaintiff claims protection. Plaintiff initially claims that its screen display formatting style is protected. MTI's Rene Laviolette testified that it was his style to: 1) center the heading at the top of the each screen display (underscoring and identifying the program name on each screen page); 2) locate the program commands, editing, and naviga-

---

As noted in *M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 438 (4th Cir.1986), "[c]ompilations are excellent examples of the minimal nature of the originality requirement in the computer field."

tional tools at the bottom of each screen page ("bottom-line programming"); and 3) to set out the functions to be performed or selection to be chosen in the middle portion or body of each screen page.

The idea underlying plaintiff's claimed expression is the manner of formatting screen displays for ease of use. The method of expressing this idea, namely the placement of common screen components in certain specific locations is limited by several constraints. First, an author may select a uniform format for all of a program's screen pages. Such a logical device creates a consistency of placement which facilitates use of the program and movement from page to page, by enabling a user to look in the same location for certain types of functions or commands no matter what page one is looking at. The alternative would be to adopt a random approach to locating certain common elements found on most screen pages. A second constraint on the idea of how to format is one of screen page space. Because a screen page is only so long and so wide, the placement of the three components listed above is necessarily limited to some type of vertical or possibly horizontal configuration.

In the adoption of a uniform format and the placement of common components of screen pages within that format, the plaintiff has adopted conventions from a very narrow range of possibilities. The plaintiff's conventions are not subject to copyright protection because:

> When the uncopyrightable subject matter is very narrow, so that the topic necessarily requires ... at best only a limited number [of forms of expression], to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all future use of the substance.... In such circumstances ... the subject matter would be appropriated by permitting the copyrighting of its expression.... [I]n these circumstances, we hold that the copyright does not extend to the subject matter at all, and the plaintiff cannot complain even if his particular expression was deliberately adopted.

*Morrissey v. Proctor & Gamble Co.,* 379 F.2d 675, 678–79 (1st Cir.1967) (plaintiff's rules for contest not copyrightable because the substance of the contest was not copyrightable); *cf. Affiliated Hospital Products, Inc. v. Merdel Game Mfg. Co.,* 513 F.2d 1183 (2d Cir.1975) ("rules" case, where court noted that since distinction between substance and arrangement blurs where the subject matter (game) is very narrow, the scope of copyright protection is very limited).

The same reasoning applies to plaintiff's claim that the "internal method of navigation" of its screen displays is subject to copyright protection. By internal method of navigation, the Court is referring to: 1) the use of the space bar to move the cursor down a list of selections; 2) the use of the backspace key to move up a list of selections; 3) the use of the return key to choose or implement a selection or function; and 4) the use of number selection to change or edit an entry. As candidly noted by plaintiff's expert, Joseph Summers, the method of program or screen navigation is influenced by the type of hardware that the software is designed to be used on. For example, he noted that a programmer writing software (such as COSTIMATOR) for use on a Wang computer would tend towards using the space bar and backspace keys as navigational tools. Therefore, the functioning of the hardware package impacts and constrains the type of navigational tools used in plaintiff's screen displays. Furthermore, the idea at issue, the process or manner of navigating internally on any specific screen displays likewise is limited in the number of ways it may be simply achieved to facilitate user comfort. To give the plaintiff copyright protection for this aspect of its screen displays, would come dangerously close to allowing it to monopolize a significant portion of the easy-to-use internal navigational conventions for computers. *See* 17 U.S.C. § 102(b); *cf. Mazer v. Stern,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954) ("unlike a patent, a copyright gives no exclusive right to the art disclosed ..."). For the same reasons, the idea of using a menu driven approach to effect external

navigation between various program components and specific screen displays is likewise not copyrightable.

■ There is, however, one final aspect common to many, but not all, of plaintiff's screen displays that does merit protection as copyrightable expression. That is the plaintiff's method of identifying the operation or department being utilized, the tooling used or required in that department, and the type of tooling material being used. COSTIMATOR screen displays have put this information directly under the underscored title of the program. When a particular department of a machine shop is selected, it is assigned an operation number which is set out as "OPERATION #" and placed at the top left margin underneath the title line. The department selected is also placed in the center of the screen page beneath the program title. Next, having selected a specific department, the user must select the tool he wishes to use. Likewise, this selection is assigned a tool number which is set out as "TOOL #" and placed against the right margin just underneath the title line. The tool selected is also displayed by name in capital letters in the center of the page on the line beneath the department selection. Next after selecting the type of tooling required, that selection is displayed in place of the tool selected in the center of the page beneath the department selection. Finally, after selecting the tooling material from the next screen page, it is displayed by name in capital letters in the center of the page beneath both the department listing and the tooling required listing. Through this progression of screen displays, the OPERATION # and TOOL # designations are maintained respectively at the top left and right margins of each screen page.

The idea of apprising the user of the status of one's efforts in cost-estimating a part is not copyrightable. Plaintiff's expression is not a necessary incident to this idea. That expression reflects selection as to what should be made part of the status report, arrangement of the terms therein, assignment of numbers to specific operations/departments and tools, and coordination in the manner of building on the status report as the user progresses through various steps. Therefore, it is copyrightable and subject to protection if infringed.[16] *Eckes, supra,* 736 F.2d at 862–63 (discussing copyrightable compilations).

To discuss plaintiff's other claims of copyright protection for the internal aspects of its screen displays not uniform or present in nearly every screen, the Court must next focus on specific screen displays and the expression, if any, contained therein.[17]

■ (Exhibit 25; screen 3) Screen 3 contains a two-column alphabetical listing of twenty machine shop departments which a part being processed might go through. This utility screen enables the user to input the user's standard costs for each of the different shops in his company so that they may be automatically applied in the cost-estimate. Plaintiff does not claim that this aspect of the screen is protectible. Rather, plaintiff seeks protection only for the alphabetical two-column display of the departments. This expression is not a proper subject of protection because it is necessarily incident to the idea of listing the departments to which shop rates need to be assigned and because there is no original authorship in this unadorned two-column alphabetical listing. *Cf.* 1 Nimmer § 2.01[B] at 2–14 (lists of contents or ingredients are not subject to copyright protection because they are "forms of expression dictated solely by functional considerations"); *see also* 37 C.F.R. § 202.1(a) (list of ingredients or contents not copyrightable). For the very same reasons, the lists

---

16. As noted in *Softklone,* the grant of this copyright protection does not extend to the use of the particular terms or symbols used therein. 659 F.Supp. at 462.

17. Here again, the Court will only consider those aspects of the screen displays which the plaintiff has specifically claimed as being infringed. Furthermore, for ease of discussion and reference the Court will only consider those screen displays identified in plaintiff's exhibit 25, which contains all of the screen displays also referred to in plaintiff's exhibits 50 and 51.

contained in Exhibit 25, screens 6, 7, and 14 are not copyrightable.[18]

■ (Exhibit 25; screen 4) Screen 4 is identified as the "job identification" screen because it asks the user to input various information about that job being performed. This screen requests that the user input alphanumeric and numeric designations next to a vertical numerical listing of "part number, part name, customer name, job number, number of pieces, p, f & d [personal, fatigue and delay], machining ratio, scrap rate, [and the estimator's] initials" in that respective order. This identification screen and its individual components are not so limited by functional considerations that the Court could conclude that the form of the plaintiff's expression is necessarily incident to the idea of identifying a particular job. This is evidenced by the fact of the redundacy in the first four items of identification listed. Any of the first four items alone might be sufficient to identify a particular job. Furthermore, the job might also be identified by asking the user to input information next to a screen entry of buyer or purchaser or manufacturer or invoice number or the like. Furthermore, in identifying a particular job, this COSTIMATOR screen display also asks the user to input specific information relative to the attributes of the particular part for which the estimate is developed. For example, in requesting information about the machining ratio, the screen display conveys to the user the need to consider and enter into the cost-estimate whether the specific part being manufactured is fragile or very solid. The same may be true for factoring in the elements of personal fatigue and delay as well as the scrap rate in manufacturing complex as opposed to more simply designed parts. For these reasons, the Court holds that there is sufficient originality in the plaintiff's selection and arrangement of the nine terms which screen 4 uses to identify a particular job.

However, for this screen to be subject to copyright protection it must also convey information, otherwise it would fall within *Baker v. Selden's* proscription on protection of blank forms. 101 U.S. 99, 25 L.Ed. 841 (1976); *Whelan*, 797 F.2d 1242–43 ("[o]nly [blank forms] that by their arrangement and organization convey some information can be copyrighted."); *cf.* 1 Nimmer § 2.18[C] at 2–201 (blank forms evincing considerable originality in suggestion of items to be recorded and arrangement of those items may be subject to protection); *Softklone*, 659 F.Supp. at 461–62 (arrangement, highlighting and capitalization of commands aids and assists user thereby conveying information); *Harcourt, Brace & World, Inc. v. Graphic Controls Corp.*, 329 F.Supp. 517 (S.D.N.Y.1971) (answer sheets in the nature of a blank form which conveyed information are subject to copyright). As suggested above, the Court is persuaded that screen 4 conveys information and is subject to copyright. First, it suggests that identifying a job entails more than just naming the prospective purchaser or person requesting the estimate as is evidenced by the identification of a job number, part number, part name, and customer name. Second, it suggests to the user, as noted above, that certain attributes of the part to be manufactured need to be considered when identifying a particular job, because those attributes will affect the derivation of an estimate. For these reasons, this screen display contains expression and is therefore, subject to copyright protection.

■ (Exhibit 25; screen 8) Screen 8 displays a variety of calculations pertaining to the operations of tapping, drilling, and countersinking a specified number of holes after designation of a particular tap size and depth. After this information is inputted by the user on previous screen pages, this screen displays the calculations for "all standards, speeds and feeds, machining costs, and machining times" with respect to each of the three operations performed.

---

**18.** Outside of the fact that there may be certain redundancies in screen 7 with respect to the designation of specific tooling operations and the fact that plaintiff abbreviates the words counterbore and countersink as "c'bore [and] c'sink," plaintiff's listing in screen 7 also lacks sufficient originality to merit copyright protection.

Plaintiff's Exhibit 62, at 5–40. The information displayed is set out in four columns. The first column contains a listing (preceded in part by numerical designations) of the items for which data is displayed in the following three columns corresponding to the three operations being performed. There is no claim that the calculated data itself is copyrightable and nor is the Court inclined to such a view. *See Financial Information v. Moody's Investor's Service,* 808 F.2d 204, 207 (2d Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987) (court notes its reluctance to grant copyright protection to non-fiction works primarily because facts may not be copyrighted). The idea expressed in this display is the formatting and selection of cost-estimating data pertaining to calculations relating to specific tooling operations done in a specific department. The use of a columnar format and the use of both upper and lower case letters are not sufficient on their own to warrant copyright protection because they lack originality. *See New Haven Copper Co. v. Eveready Machinery Co.,* 229 U.S.P.Q. 838 (D.Conn.1986) [1986 WL 269] (column headings and format used to express the plaintiff's economic analyses lacked the necessary originality to support a copyright); *see also* 37 C.F.R. § 202.1. Nor is the listing of items for which data is supplied subject to copyright because, in the language of the machining industry, speeds and feeds, machining times and costs, and data specific to the size, depth, and diameter of the hole is all closely related to and hence incident to the idea of displaying this data to the cost-estimator. This fact was borne out in the testimony of plaintiff's experts, Michael Ellis and Joel Goldberg. That functional considerations play a significant role in determining what data is given to the user is corroborated by Exhibit 25—screen 15 which also contains a list which is very similar to that contained in screen 8 for a different operation in a different department. For the same reasons, screen 15 is also not subject to copyright.

(Exhibit 25; screens 9 and 10) Screens 9 and 10 contain a single column list of items affecting the generation of a cost component for costs associated with handling a specific part. The list includes items such as "setup time, non-cutting elements, fixture costs, gage costs, gage frequency time/cost, cutting tool cost, and parts move time." Very little evidence was offered by the defendants as to the copyrightability of this list and whether functional considerations limit the selection and arrangement of the items included therein. In this regard defendant's expert did not offer testimony that would have assisted the Court's determination on this issue. For this reason, the presumption of validity of the copyrightability of this information has not been rebutted.

(Exhibit 25; screens 11, 12, 13, 16, and 17) Similarly, outside of indicating components common to all the other screen displays, the plaintiff's offered no specific claims of protection or evidence with respect to the material contained in the body of screens 11, 12, 13, and 16. Therefore, the Court will not consider those very limited unique aspects of these screens as proper subjects of protection. Finally, with respect to screen 17, the plaintiff has made an insufficient showing of originality to warrant protection.

## B) *Forfeiture of Copyrights*

The defendants also argue that to the extent that the screen displays do contain copyrightable subject matter, the plaintiff has forfeited its right to those copyrights because it published copies of certain screen displays without copyright notices. This defense is first raised in connection with the COSTIMATOR brochure the defendants admit having in their possession at the time they developed QC III and RC. Plaintiff admits that three different versions of the COSTIMATOR brochure containing the same seven screen displays were distributed without copyright notice to roughly 26,600 prospects and 1,500 dealer representatives from the Spring of 1983 through June of 1986. However, plaintiff did put on evidence that showed that the promotional packet of materials (the "Lit Kit") of which the brochure was a part did include some article excerpts published by

MTI which contained copyright notices dated as early as 1986. No evidence was offered as to Lit Kits sent out prior to the preliminary injunction hearing.

The defendants also raise the forfeiture question with respect to seventeen screen displays contained in 112 copies of a brochure entitled "The System" sent out with price quote packages by the plaintiff. These distributions also did not contain copyright notices. However, the price quote package did contain a copy of a sales and licensing agreement which plaintiff argues put the recipients on notice of MTI's intention to preserve it rights in its product and protect it from unauthorized copying. After learning of this omission and after the filing of their complaint, in February 1987 plaintiff sent out 112 stick-on labels with the appropriate copyright notice to price quote and system packet recipients.[19]

■■■■ Notice of copyright is required under 17 U.S.C. § 401 to protect a work under U.S. copyright law. Omission of copyright notice does not invalidate the copyright in a work if: 1) the notice has been omitted from a "relatively small number of copies;" or 2) the registration of the work is made before or within five years of the time of publication and reasonable efforts are made to add copyright notices to all copies after the omission has been discovered. 17 U.S.C. § 405(a). The plaintiff has obtained the requisite copyright registrations within the five year period dating from the date of publication. Given, the fact of the plaintiff's corrective efforts in the case of the system brochure, the Court holds that plaintiff did not forfeit its copyright in the screen displays contained therein.

The omission of copyright notices from the COSTIMATOR brochure screen displays presents a somewhat closer question. In this instance, there was no "limited publication" so 17 U.S.C. § 405(a)(1) does not apply. However, section 405(a)(2) may apply if reasonable efforts were made to correct the omission of the copyright notice

after its discovery. No efforts were made to correct those COSTIMATOR brochures previously sent out. However, there was testimony by MTI's Rossow that the latest version of these brochures does contain a copyright notice and that other materials distributed in the Lit Kit packets did contain copyright notices.

■■■■ Whether this corrective effort was reasonable to effect a cure of the omission is a question of fact. 2 Nimmer § 7.13[B][2] at 7–97. "A fair reading of [the language of section 405(a)(2)] indictes that it covers *all* copies bearing defective notices at the time the defect is discovered, and which have not yet been distributed to the public—that is, all those copies which are distributed after the defect is discovered." *Shapiro & Son Bedspread Corp. v. Royal Mills Assoc.*, 764 F.2d 69, 74–75 (2d Cir.1985); *accord Andrews, supra,* 783 F.2d at 444 (the duty to use reasonable efforts to correct the omission of copyright notice does not apply to copies already distributed to the public). Apparently, the omission was discovered sometime during the early part of discovery of this case. Neither party's presentation of its evidence was particularly helpful or indicates when the omission was remedied by the plaintiff. Likewise, the plaintiff's argument that the Lit Kit contained other publications which did contain the notice of COSTIMATOR copyright is less than compelling because it has presented no evidence indicating that this is true with respect to Lit Kits sent out prior to the preliminary injunction hearing when the defendants were developing their programs. However, the defendants, especially Laviana and Cormier and thereby CAMS, were on notice of plaintiff's proprietary interest in its programs based on their negotiations to become sales representatives as opposed to joint venturers with MTI, their knowledge of the sales and license agreement, their viewing of program demonstrations at which the first screen displayed on the computer screen bore the appropriate copyright notice, and their ac-

---

**19.** In their post trial brief, defendants also raise the issue of whether COSTIMATOR programs and user's manuals were sent out without copyright notices. However, since defendants have submitted no evidence supporting this claim the Court will not consider it.

cess to the user's manual which contained the copyright notice for COSTIMATOR version 01.00 on the first page. In light of their knowledge and the corrective efforts taken, the Court finds that the plaintiff's corrective efforts were reasonable and holds that there was no forfeiture of the copyright to the screen displays contained in the COSTIMATOR brochures.[20]

### C) Copying

#### 1) Access

To proceed with its claims of copyright infringement, the plaintiff must demonstrate that the defendants had access to the copyrighted works. *See Walker, supra,* 784 F.2d at 48. As is clear from the finding of facts, the Court has determined that the defendants had access to COSTIMATOR screen displays and its user's manual (which itself contains copies of screen displays).[21] There is, however, no evidence that the defendants had access to the plaintiff's source code nor did plaintiff put forth any evidence of source or object code similarity.[22]

#### 2) Substantial Similarity

■ In the Second Circuit the standard for determining whether works are substantially similar is whether they appear so from the "spontaneous response of the ordinary lay observer." *Id.* at 51 (citation omitted). However, in *Arnstein v. Porter,* 154 F.2d 464 (2d Cir.1946), the court set out a two-part test for similarity which guides this Court's analysis. *See also Walker, supra,* at 51–52 (discussing the continued validity of the *Arnstein* test). That test

provides that in a complex case such as this the Court may first consider expert testimony relevant to the question of whether there is sufficient similarity between non-protected aspects of the two works at issue to establish copying. *Id.* Then, if and only if copying is established, the fact finder must determine without the assistance of expert testimony whether there are substantial similarities between the protected aspects of plaintiff's work and the allegedly infringing work indicating "illicit copying" or infringement. *Id.*

■ As for the first test, the plaintiff presented the testimony of six witnesses versed in the fields of computer programming and cost-estimating which the Court found quite compelling. Their unanimous conclusion, based on the similarity of the screen displays at issue, was that the screen pages could not have been developed independently of one another. Outside of the striking overall stylistic and format similarity in some of the screens discussed at trial, the specific similarities these experts noticed were as follows: First, both program used terminology not common to the trade, such as the term "parts/move/time" in screen 9. Second, both consistently used upper and lower case letters with respect to certain terms contained in COSTIMATOR screens 8 and 15. Both COSTIMATOR and QCIII vary from the use of upper case letters otherwise consistent throughout the programs when setting out the terms "Revolutions/Minute, Inches/Minute, Surface Feet/Minute, and Inches/Revolution." As

**20.** Furthermore, in light of the fact that COSTIMATOR version 01.00 contains some three hundred screen displays, even if the Court held the plaintiff forfeited its rights to the seven screen displays in the brochure, such a forfeiture would be *de minimis* and not invalidate the remaining aspects of the screens subject to copyright.

**21.** Whether one defines access as requiring only a reasonable opportunity to view or copy *or* as requiring actual viewing or knowledge of plaintiff's work, *see* Nimmer § 13.02[A], the Court has no difficulty in deciding that the defendants had the access described above.

**22.** The Court rejects the plaintiff's argument that defendant St. Martin had access to the

source code. At the preliminary injunction hearing, defendant St. Martin testified that he was given "a cost estimating program [by Mr. Laviana], something called COSTIMATOR, one that had many screen displays similar to what I saw this morning [and which did not have a data base capability]." On this point, the Court accepts defendants argument that defendant St. Martin misspoke and was referring to QCI because it is clear, despite plaintiff's failure to disclose the same to the Court, that he was referring to a non-data based program. Unlike COSTIMATOR and QC III, V, X and the RAPID COST programs, QCI is not a data base program.

noted by Jeffrey Fencer, this similarity is telling because there is no functional justification for it and all it serves to do is to confuse and distract the user. Third, outside of the overall similar program segmentations, these experts also noted similarities in group segmentation displayed on particular screen display pages. For example, they noted the duplication in grouping in the number of columns used in particular screen displays and also identified duplication in the alphabetical ordering of the terminology presented in the columns of various screens. This latter similarity struck Joseph Sommers as somewhat odd because the usual convention for grouping various terms is based on frequency of selection of those terms. Fourth, Jeffrey Fencer found duplication in the manner that the both sets of screen displays use to accomplish "navigation" from menu to operation, from screen to screen, and from moving among item selections on any specific screen through the use of the space bar, the backspace key, and the use of the return key. Finally, these experts noticed "redundancies" common to both sets of screen displays that a machinist writing a cost estimating program might not replicate. For example, screens 7 and 8 refer to a sequence of operations, "TAP–DRILL–C'SINK [countersink]" which Joseph Sommers and Michael Ellis noted as redundant in its reference to drilling because countersinking presupposes that a hole is already drilled. The QC III screen displays contain this same redundancy.

■ Applying the second part of the substantial similarity test, the Court concludes that the defendants' screen displays unlawfully appropriate the copyrighted material contained in the plaintiff's screen displays. First, the sequencing and flow of the creating-an-estimate series of screen displays of both sets of programs is substantially similar.[23] Like the plaintiff's screens, defendants' flow from collecting initial job information to material selection (omitting the scaling of the sonic digitizer) to operation selection to process informa-

tion to handling costs (omitting the possibility of additional operations and omitting engineering and sales costs) to additional operations to finally report generation.

Second, there is substantial similarity in the plaintiff's and defendants' mode of expressing the status of user efforts in cost-estimating a part. Like, plaintiff's screen pages, the defendants' pages assign the name of operation to the specific department invoked by the user and a number to every operation and tool. Furthermore, defendants uses plaintiff's convention of placing the operation and tool numbers underneath the title line respectively against the left and right margins. Next, defendants also center underneath the title line the complete name of the specific operation/department invoked by the user as well as additionally identifying adjacent to the department (as opposed to immediately underneath in plaintiff's screen) the process or tooling operations being performed. This substantial similarity is an infringement of this aspect of the protected expression common to many of plaintiff's screen displays.

Next, there is also substantial similarity between plaintiff's copyrightable expression in screen 4's job identification listing and the defendants' counterpart screen. Of the nine items listed in plaintiff's screen, four are exactly duplicated in the defendants' seven screen items, while two others are identified in very similar fashion. While the ordering of the defendants' seven items is different from the plaintiff's, the nearly identical replication of this list is sufficient to establish substantial similarity and illicit copying.

From the perspective of a reasonable lay observer, the Court is unable to find substantial similarity between the screens compared on pages 9 and 10 of Exhibit 25. The fact that three terms on defendants' screen 9 are similar to three of the seven terms on plaintiff's screen nine is not sufficient to establish illicit copying. Further-

---

**23.** Despite defendants' argument that the QC and RC programs evolved from QCI, this flow is

not evidenced therein.

more, the fact that defendants' screen 9 refers to handling time items of reference as opposed to the plaintiff's handling costs references is a significant dissimilarity. Nor is the use by both screens of the term "parts move time" so significant to change this conclusion. Much the same is true with those screens compared on page 10 of Exhibit 25. Simply put, the fact that three of the seven items listed on defendants' screen are almost identical to three of the seven items on plaintiff's screen is not sufficient to establish substantial similarity.

### D) *The Nature of the Infringement and the Appropriate Remedy*

Having decided that there has been illicit copying of plaintiff's works, the Court must now specify which copyrights have been infringed. First, the Court rejects plaintiff's claim that its source code has been infringed as without adequate foundation. *See supra* note 21. Therefore, to that extent the program copyrights have not been infringed. Nor has plaintiff's copyright in its user's manual been infringed. Because the user's manual is a work based on and derived from the screen displays themselves, the scope of the copyright protection granted it is limited to those original, nontrivial aspects of the manual separate from the material encompassed within the pre-existing work. *See* 17 U.S.C. §§ 101, 103(b); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909–11 (2d Cir.1980). Though the Court expresses no opinion as to the validity of the user's manual copyright, no infringement of it has been shown since the plaintiff has not shown and does not claim that original, nontrivial aspects of the user's manual are encompassed within the screen displays.

However, by illicitly copying the creating-an-estimate sequence and flow, the plaintiff's convention for providing status information on its screen pages, and plaintiff's job information expressions, the defendant has appropriated the requisite qualitative portions of plaintiff's protected expression to infringe plaintiff's screen display copyrights. *See Whelan*, 797 F.2d at

1245 (qualitative judgment as to the extent of substantial similarity by the court will suffice). To hold only that the copyright of the screen display registration has been infringed is insufficient because that registration is limited only to the eleven screens submitted therewith and as such does not fully encompass, for example, the expression of the creating-an-estimate sequence. Therefore, the Court holds that the defendants have infringed the copyright of the screen display registration (TX 1–737–903) as well as the copyright of the screen displays subsumed within the registration of COSTIMATOR program version 01.00 (TX 1–544–052). This infringement was perpetrated with the defendants' actual knowledge of their infringing conduct and therefore was willful. *See Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1115 (2d Cir.1986).

The Copyright Act authorizes a court to issue a permanent injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). However, this extraordinary remedy is only available if the plaintiff has established liability and can show a probability or threat of continuing infringement. *Encyclopaedia Brittanica Educational Corp. v. Crooks*, 542 F.Supp. 1156, 1187 (W.D.N.Y.1982) (citing 3 Nimmer § 14.06 at 14–55–14–56). The evidence in this case demonstrates the existence of such a threat. Therefore, permanent injunctive relief is appropriate.

## II. PLAINTIFF'S UNFAIR COMPETITION CLAIMS

In the second count of the complaint, the plaintiff raises several claims which should have been pleaded as separate counts. For ease of understanding the Court will discuss each of them separately and rule accordingly.

### A) *Lanham Act Claim*

The Lanham Act is designed to ensure truthfulness in advertising and to eliminate misrepresentations about the inherent quality or characteristics of a product. *Vidal Sassoon, Inc. v. Bristol–Myers*

*Co.*, 661 F.2d 272, 278 (2d Cir.1981). To that end, section 43(a) of the Lanham Act provides, in pertinent part that

[a]ny person who shall affix, apply, or annex, or use in connection with any goods, a false designation of origin, or any false description or representation, including words of other symbols tending falsely to represent the same ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a). To make out a violation of section 43 the plaintiff must show: 1) the involvement of goods or services; 2) an effect on interstate commerce; 3) a false description or designation of origin with respect to the goods or service involved; and 4) a reasonable basis for the belief that one has been injured. *See Consumers Union, Inc. v. New Regina Corp.*, 664 F.Supp. 753, 764 n. 12 (S.D.N.Y.1987).

██ Plaintiff argues that the defendants have violated the Lanham Act by falsely describing the capabilities of their computer programs and by falsely representing the origin of those programs.[24] As for the first contention, defendants Cormier and St. Martin admitted that the advertising brochures' capability charts for both the QC and RAPIDCOST programs misstated the capabilities of QCX and RC3. Specifically, the QC capability chart misrepresents that QCX and QCXD had the capability to perform "operation/dept. technical modeling." Likewise, RC3 and RC3D's capabilities were overstated with respect to performing that function as well as "process[ing] three (3) quantity lots." The Court finds unpersuasive defendants' excuse that these functions were in development though not on-line at the time that the advertising brochures were printed be-cause, as agreed by both defendants, these falsehoods would deceive unknowing customers about the quality and characteristics of the defendants' programs. Likewise, the Court is not persuaded that defendants' subsequent corrections of these misstatements (of which there is no proof except for defendants' testimony) disposes of plaintiff's claims because the fact of correction does not affect plaintiff's right to collect for any past injury suffered as a result of the false claims.

MTI's Laviolette noted that the plaintiff's program performed all of the functions contained in defendant's capability charts but one ("additional markup routine"). Plaintiff also put on evidence showing dissatisfaction with defendants' programs and returns of the same for a variety of reasons some of which related to product quality and performance. Finally, plaintiff put on expert testimony indicating that the goodwill of competitors is damaged when a potential buyer of software is "burned" and misled as to the performance and ability of a certain type of software. Under these circumstances, the Court concludes that the plaintiff has met its burden of demonstrating a reasonable basis for the belief that it was injured as a result of the defendants' false advertising. *See Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir.1980). There is no dispute that the programs at issue were sold in interstate commerce and that the false advertising about those programs also was widely distributed in interstate commerce. Moreover, since the advertising at issue contained statements that were patently false, as opposed to merely having a tendency to deceive, the Court holds that the plaintiff has established defendants' liability and need not put on evidence of actual consumer confusion.[25] *See PPX Enter-*

---

24. The plaintiff also argues that the defendants made false quality comparisons asserting that their QC line of programs were as good as COSTIMATOR. While this may have been the implication of the capabilities chart in defendants' advertising, there is no evidence as to express quality comparisons made by the defendants either in their face-to-face dealings with customers or in their advertising; therefore the Court need not consider this issue.

25. Plaintiff is advised, however, that in measuring the quantum of damages, if any, flowing from this violation the Court will not engage in speculation and will require a solid evidentiary basis on which to grant any award. *See Vuitton Et Fils, S.A. v. Crown Handbags*, 492 F.Supp. 1071, 1077 (S.D.N.Y.1979).

prises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266, 273 (2d Cir.1987).

The plaintiff also contends that defendants violated section 43 by falsely representing the origin of their computer programs and in particular the screen displays. The Plaintiff argues that, by illicitly copying COSTIMATOR screen displays and copyrighting them under their own name and selling them to the public at-large, the defendants have falsely represented the origin of their program and its screen displays. This argument finds support in *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir.1982), in which the Second Circuit held that the copyright notice of an infringing copyright was tantamount to a false claim of originality actionable as a false designation of origin or false description under the Lanham Act. *See also F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 214 U.S.P.Q. 409 (7th Cir.1982). To determine whether this merits an additional independent basis of liability under the Lanham Act, the court must focus on whether there exists a likelihood that a substantial number of consumers would be misled or confused as to the source of defendants' screen displays. *Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2d Cir.1985).

As for the likelihood that the customers would be misled, the Court finds persuasive defendant St. Martin's testimony that customers have told him "QC is identical to COSTIMATOR." Given the Court's finding of infringement, this observation was not merely based on coincidence. Furthermore, given the emphasis and importance of the screen displays to both the advertising and selling efforts of these types of programs as testified to by plaintiff and its expert, Timothy Denny, the Court finds it likely that consumers would be misled by the claim of originality inherent in the copyright notices attached to defendants' programs and screen displays. As noted in *Eden Toys*, there is a likelihood that the plaintiff would be damaged by this falsehood because "this deception can mislead consumers into believing that the [good] they purchased is a unique novelty instead of a common copy...." 697 F.2d at 37.

Finally, the inability of the plaintiff to obtain comprehensive sales information from the defendants through discovery until during the trial should be held against the defendants on the question of consumer deception here. Finding that the plaintiff has demonstrated a reasonable basis for believing that it has been injured by the defendant's false designation of origin, the Court holds that the plaintiff has established an additional and independent basis for liability under section 43(a) of the Lanham Act.

**B)** *The Connecticut Unfair Trade Practices Act ("CUTPA") Claim*

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn.Gen.Stat. § 42–110b(a). In *Sportmen's Boating Corp. v. Hensley*, 192 Conn. 747, 474 A.2d 780 (1984) the court set out three criteria which should be applied to determine whether a particular act or practice violates CUTPA. They are:

(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law ... or other established concept of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; 3) whether it causes substantial injury to consumers [competitors or other businessmen].

Id. at 756, 474 A.2d 780.

Plaintiff claims that the defendants violated CUTPA by "knowingly using false comparative advertising claims ... in face-to-face sales situations" and by falsely advertising about the capability of the programs they sold in the manner discussed earlier. As noted earlier there is no evidence that the first contention is accurate, therefore the Court need not consider it. As for the second contention which is a restatement of the Lanham Act false advertising claim, the Court is guided by its analysis in *Dial Corp. v. Manghnani Investment Corp.*, 659 F.Supp. 1230 (D.Conn. 1987). In *Dial*, this Court stated that to

the extent the defendant's actions violate section 43 of the Lanham Act, they also violate CUTPA. *Id.* at 1239. The same is true here.

## III. BREACH OF FIDUCIARY DUTY CLAIM

In Count III the plaintiff asserts that defendants Cormier, Laviana, and CAMS became plaintiff's agents when acting as its sales representatives, who breached their fiduciary duty by competing with the plaintiff during the duration of the agency relationship and by misusing trade secret and confidential information garnered during that relationship.

To succeed with this Count, plaintiff must first establish that an agency relationship existed. To do that it must show that MTI indicated that it consented to have these defendants act in its behalf, that these three defendants accepted the undertaking, and that the parties understood that MTI would be in control of the undertaking. *See Beckenstein v. Potter and Carrier, Inc.*, 191 Conn. 120, 133, 464 A.2d 6 (1983). Additionally, as agents these three defendants must have been acting "at the behest and for the benefit of the principal." *Id.* There is little doubt that the first two elements have been met.[26]

However, plaintiff failed to establish that it controlled the activities of Cormier, Laviana and CAMS. Factors indicative of "control" are the right of the principal to direct and control the work of the agent, whether the agent is engaged in a distinct operation, whether the principal or agent supplies the instrumentalities, tools, and place of work, and the method of payment. *Id.* (citing 1 *Restatement (Second) Agency* §§ 14, 220 (1958)). In applying these factors a court must look to the operative terms of an agreement or understanding

and not elevate form over substance. *Id.* at 133–34, 464 A.2d 6.

These three defendants were not subject to the requisite control to be deemed agents of the plaintiff. MTI's right to direct and control the performance of the defendants was extremely tenuous if it existed at all. By definition, the defendants were free to sell any products of their choosing, including a crude program arguably for cost estimating owned by them entitled QCI. If in fact they were subject to plaintiff's control, plaintiff might have sought to preclude the defendants' sale of QCI and limit their ability to sell other products. While plaintiff did set the price and limit the geographical area in which the defendants could pursue sales, these were the only meaningful limits placed on the defendant's activities. Nowhere is there any indication that defendants were under any reporting obligations to the plaintiff or that they were required to reach some specified level of sales. Furthermore, defendants were clearly engaging in a distinct operation wherein plaintiff provided neither the instrumentalities, tools, nor the place of work. For example, when the defendants wanted COSTIMATOR sales brochures they had to purchase them from plaintiff. The fact that plaintiff paid the defendants on commission, as opposed to salary, also highlights its lack of control. Finally, the fact that the sales representation ended for all practical purposes in February 1984 and that it took MTI (and the defendants) nearly three months to terminate it also indicates plaintiff's failure to direct and control the defendants' performance. For all these reasons, the Court holds that the plaintiff has failed to establish that an agency relationship existed between itself and Cormier, Laviana and CAMS. Therefore, it is not entitled to

---

**26.** MTI's letter to defendant Cormier on December 5, 1983 and his response thereto on December 13, 1983 form the basic framework for his and CAMS' sales representation of MTI. In that letter, MTI gave them a non-exclusive authorization to sell COSTIMATOR in Connecticut at a price set by MTI, for a 20% commission, with the entire agreement being cancellable by either party on thirty days written notice. It also provided that the sales representatives would direct interested customers to MTI for product demonstrations at MTI's headquarters. The agreement does not specify nor was the testimony itself very enlightening as to which party actually closes the sales made.

recover on its claim for breach of fiduciary duty.

## CONCLUSION

Accordingly, judgment shall enter for the plaintiff on its copyright infringement, Lanham Act, and CUTPA claims. Judgment shall enter for the defendants on the breach of the fiduciary claim. Furthermore, the Court directs that from the date of the entry of this judgment, the defendants are hereby permanently enjoined from engaging in or facilitating the manufacturing, advertising, selling, leasing, or licensing of the infringing QC III, V, and X and RC 1, 2, and 3 series of programs. A status conference will be held on February 14, 1989 at 9:00 AM to discuss scheduling the damages phase of this case.

SO ORDERED.